NO. 4-06-0688     Filed 5/2/07

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| ROSE WHITE, Individually and as | ) | Appeal from |
| Administratrix of the Estate of DON | ) | Circuit Court of |
| R. WHITE, Deceased, | ) | McLean County |
|      Plaintiff-Appellee, | ) | No. 02L136 |
|      v. | ) | |
| GARLOCK SEALING TECHNOLOGIES, LLC, | ) | Honorable |
|      Defendant-Appellant. | ) | James E. Souk, |
| | ) | Judge Presiding. |

_____

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

In August 2002, plaintiff, Rose White, sued defendant Garlock Sealing Technologies, LLC, and several other defendants for the wrongful death of her husband, Don R. White, decedent. White alleged that decedent developed asbestosis and died as a result of occupational exposure to defendants' asbestos-containing products.

Following a November and December 2005 jury trial, the jury returned a verdict for Garlock. White filed a timely posttrial motion, alleging that Garlock violated numerous trial court orders and rulings. In July 2006, the trial court granted White's motion for a new trial, upon finding that Garlock violated Supreme Court Rule 213(i) (210 Ill. 2d R. 213(i)). In addition, the court ordered that on retrial, the testimony of one of Garlock's expert witnesses would be limited.

In August 2006, Garlock petitioned this court for leave to appeal, pursuant to Supreme Court Rule 306(a)(1) (210 Ill. 2d R. 306(a)(1)). In September 2006, we granted Garlock's petition, and we now affirm.

## I. BACKGROUND

Because the record in this case is lengthy, we discuss it only to the extent necessary to review the narrow issues before us: (1) Did Garlock violate Rule 213(i), which provides that a party has a duty to seasonably supplement or amend any prior answer or response to an interrogatory whenever new or additional information subsequently becomes known to that party, and (2) if so, did the trial court's remedial action constitute an abuse of its discretion?

### A. The Factual Context of White's Lawsuit

The evidence at the jury trial showed that decedent worked for 40 years at the Havana, Illinois, power plant in various capacities, including boiler operator and pipefitter. Garlock asbestos-containing packing and gaskets were used at the plant throughout his career. White presented evidence that when these gaskets were "applied and removed," they gave off asbestos dust that traveled throughout the plant. Decedent's family physician testified that decedent developed asbestosis, which was the cause of his death, as a result of the total and cumulative effect of all the asbestos he inhaled.

- 2 -

Garlock presented evidence that because the asbestos fibers incorporated into its gasket and packing products were encapsulated--that is, coated in rubber, elastic, and other polymers--the products did not emit respirable asbestos fibers at levels sufficient to cause asbestosis. Garlock also presented evidence that testing on its gaskets and packing products showed that under actual-use conditions, they produced extremely low-level asbestos exposure--that is, exposure at levels similar to or below ambient levels in most metropolitan areas. Garlock also presented epidemiological studies to further show that exposure to asbestos at levels found in the ambient air did not result in an increased incidence of asbestos-related disease.

B. Garlock's Pretrial Disclosures Regarding Its Controlled Expert Witness, Dr. Steven R. Smith

In answer to White's interrogatories, Garlock identified several expert witnesses, including Steven R. Smith, M.D., director of occupational and environmental health and medicine for the Community Health Network and community hospitals in Indianapolis, Indiana. Garlock provided White with Dr. Smith's detailed, 21-page, single-spaced report in which he analyzed decedent's occupational and medical histories, made observations about the findings and conclusions reached by his treating physicians, questioned whether the medical evidence showed that decedent suffered from asbestosis, and noted the presence of clinical findings of pulmonary aspergillosis, which is a fungal

infection in the lungs. In pertinent part, Dr. Smith's report contained the following conclusions:

(1) On the basis of the materials that had been provided to him, the evidence was insufficient to support a determination to a reasonable degree of medical certainty that decedent suffered from asbestosis or any other asbestos-related disease or disorder.

(2) Even if decedent did suffer from asbestosis "(and possibly died as a result thereof)," any asbestos exposure resulting from working with or around Garlock gasket- and packing materials was pathogenically insignificant. Decedent's level of gasket and packing-derived cumulative occupational asbestos exposure would clearly be de minimis and incapable of causing or substantially contributing to the causation of asbestosis.

(3) If decedent did have any clinically significant degree of asbestosis "(and he may well have)," it was caused by his exposure to insulation materials, not by his exposure to gaskets and packing.

(4) "It is not possible for me to state,

to a reasonable degree of medical certainty, that [decedent] either did have or did not have bona fide asbestosis."

(5) "The finding of ostensible Aspergillus mold/fungal organisms within the cavitary lesion within the resected upper lobe of decedent's right lung deserves comment.  The exact significance of this finding is unclear."

White did not depose Dr. Smith.  Shortly before the November 2005 jury trial, Garlock's counsel faxed to White's counsel a letter, identifying it "as [its] supplement 213(f)(3) [disclosure] regarding the opinions and report of Dr. Steven Smith," stating that Dr. Smith had an opportunity to review many documents pertaining to the case (which the letter identified) since he had prepared his initial report.  The letter concluded as follows:

"The review of the above material does not change Dr. Smith's opinions as set forth from his earlier report.  Dr. Smith is still of the opinion that Garlock gaskets and packing materials did not cause or contribute to the causation of [decedent's] alleged asbestosis. Further, Dr. Smith is of the opinion that

Garlock sealing products did not contribute in any manner to [decedent's] supposed asbestosis-related death as set out in his earlier report."

### C. Dr. Smith's Trial Testimony

The jury trial lasted almost four weeks.  After White rested her case, Garlock presented its evidence, which included Dr. Smith's testimony.  He testified on direct examination substantially consistently with the discovery materials that Garlock had furnished White.  When Garlock asked Dr. Smith whether he had indicated in his report that he did not rule out the possibility of asbestosis, Dr. Smith responded, that "it was plausible, yes."

On cross-examination, White suggested that Dr. Smith was "sort of like the Monday morning quarterback," in that he was pointing out the errors made by other Illinois doctors.  Dr. Smith responded in part, as follows:  "I'm not casting stones at any physicians.  I'm just saying that [decedent] did not have asbestosis[,] and to the extent that he did, gaskets and packing materials did not cause or contribute to it."  White questioned Dr. Smith about this statement, and he responded, "I don't believe that [decedent] had asbestosis."  Later during his cross-examination, Dr. Smith further stated that "the scientific and medical evidence in this case would indicate that [decedent]

- 6 -

didn't have asbestosis as a cause of his lung problem[,] and it was aspergillosis that caused it."

White cross-examined Dr. Smith extensively until the trial court took a recess. When court reconvened out of the jury's presence, White made a motion to strike Dr. Smith's testimony on the ground that the opinions Dr. Smith testified to on cross-examination--namely, that decedent did not have asbestosis--had not previously been disclosed in Garlock's Rule 213 disclosure. Garlock objected and claimed that the opinion had been disclosed. When the court asked Garlock to point to where Garlock had disclosed that opinion of Dr. Smith, Garlock did so, and the court expressed doubt. The court noted that the document Garlock referred to quoted Dr. Smith as saying that "it is not possible for me to state to a reasonable degree of medical certainty that [decedent] either did have or did not have bona fide asbestosis." The court pointed out that Dr. Smith had given an opinion in court that differed from that report because he had just testified that the decedent did not have asbestosis. The court again pointed out that Dr. Smith's disclosed opinions were that "he saw things which were not consistent with asbestosis. But, his final *** conclusion is it's not possible to state the required standard whether the [decedent] did or didn't have asbestosis." The court noted that Dr. Smith had just testified definitively that the decedent did not have asbestosis and added

that, "I hardly need to point out [that whether the decedent had asbestosis] is something of a major issue in this case."

Garlock then argued that Dr. Smith never testified to that effect on direct examination. The trial court responded as follows: "Well[,] tell me what difference it makes. On cross-examination, doesn't the plaintiff have the right to expect that the doctor's answers on cross-examination are going to be consistent with his disclosures?"

The trial court took the matter under advisement to read the transcripts of Dr. Smith's direct and cross-examination. After reconvening, the court granted White's motion to strike, explaining as follows:

"THE COURT: Well, I think [White] is correct on this issue. This goes beyond the [Rule] 213 disclosure, and I might add, again, this is not on a minor issue in this case. *** Clearly[,] the claims of [White] for the last three years have been that [decedent] had asbestosis and it was the cause of his death, and if an expert that [Garlock] was going to put on the stand is going to state an opinion, direct, cross, redirect, recross, or anywhere, that it was this witness' opinion, however plausible or possible

- 8 -

it might be that somebody else might have a different opinion, that [decedent did not have] asbestosis, to not put that as [a] clear, unequivocal statement of his opinion in the [Rule] 213 disclosure is--well, it's certainly surprising that we would be discussing this issue at this point in this trial."

The court also noted that White's question of Dr. Smith that brought his first response that decedent did not have asbestosis did not "really have anything to do with asbestosis specifically, and it was really a volunteered, nonresponsive answer by the doctor."

In fashioning its remedy, the trial court explained that because Garlock's disclosures regarding Dr. Smith's testimony contained "many signs" that asbestosis was not likely in this case, the court considered it a sufficient remedy to strike Dr. Smith's opinion testimony that decedent did not have asbestosis. In so ruling, the court also noted that none of Garlock's disclosures regarding Dr. Smith contained an indication that he believed aspergillosis was the cause of decedent's death. Thus, the court ordered that in addition to prohibiting Dr. Smith from giving any further opinions that he believed decedent did not have asbestosis, he was not to give any further opinions "either

directly or impliedly that the cause of death was aspergillosis."

White continued to press the trial court to strike all of Dr. Smith's testimony, but the court declined and instructed the jury that Dr. Smith's testimony regarding (1) whether decedent had asbestosis and (2) the cause of his death would be stricken and was to be disregarded. The court further explained to the jury that the court took this action because Garlock had failed to disclose this testimony to White in advance of trial, as Garlock was required to do.

D. The Jury's Verdict and White's Posttrial Motions

When plaintiff first filed this lawsuit, she was suing several different defendants. By the time of trial, only Garlock and Sprinkmann Sons Corporation were still defendants in the case. Following the presentation of evidence and arguments, the jury returned verdicts in favor of Garlock and Sprinkmann and against White. The jury was also given three special interrogatories, to which they provided the following answers: (1) First Interrogatory: "Did you find that the evidence presented in this case established that asbestosis from Owens Corning Kaylo was a proximate cause of the injury to and death of [the decedent]?" The jury answered yes. (2) Second interrogatory: "Did you find that the evidence presented in this case established that products from Garlock was a proximate cause of the injury to and death of [the decedent]?" The jury answered no. (3) "Did you

- 10 -

find that Sprinkmann's intentional destruction was the proximate cause of [White's] inability to prove products from Garlock was the proximate cause of the injury to and death of [the decedent]?" The jury answered no.

In February 2006, White filed a posttrial motion, alleging, in pertinent part, that the trial court erred by not striking Dr. Smith's testimony because it violated Rule 213(i).

E. The Hearings on White's Posttrial Motion

At the April 2006 hearing on White's posttrial motion, White argued again that Garlock failed to comply with the requirements of Rule 213(i), which imposed a duty on Garlock to seasonably supplement or amend any prior answer or response to an interrogatory whenever new or additional information subsequently becomes known to that party. Garlock acknowledged at this hearing that on the Saturday night before Dr. Smith testified, Dr. Smith phoned Garlock's counsel and said, "I think this guy ha[d] aspergillosis, if you really want to know." Garlock's counsel told the court that he informed Dr. Smith "that's not where we are going in this case, and that's not our theory. *** We're not going to talk about that, and this case is not about aspergillosis."

Garlock's counsel also explained to the trial court that he had understood that "a number of days before trial is far too late for [Dr. Smith's new] opinion to be elicited at trial."

- 11 -

Thus, he advised Dr. Smith that he could not offer those opinions at trial.

The trial court then asked Garlock to respond to White's position that the issue was not whether Garlock would have been allowed to use the new opinion, because it was still obligated to disclose it prior to trial. Garlock responded that "the reality of asbestosis litigation is that experts constantly develop new opinions all the time after disclosure deadlines in a case." Garlock asserted that it had imposed upon itself the relief that White would have requested--namely, it did not elicit Dr. Smith's new opinions on direct examination.

The trial court noted that it viewed the shift in Dr. Smith's opinion as significant, noting that (1) whether the deceased even had asbestosis and (2) the cause of death were critical issues. The court indicated that White was entitled to know about Dr. Smith's new opinion for cross-examination purposes even if Garlock would not be able to use the information itself. The court further stated as follows:

> "Regardless of what you might be allowed to use because of the timeliness problems, aren't you required to update opinions, and in this case you not only didn't update the opinion, but when you filed your last disclosure immediately before trial, you indicated

the review of these further materials does

not change [Dr. Smith's] opinion in any way."

At the conclusion of the April 2006 hearing, the trial court took White's posttrial motion under advisement. A few weeks later, the court stated that it wanted to hear further evidence and directed Garlock to produce Dr. Smith to testify at the next hearing on White's posttrial motion.

In July 2006, the trial court renewed the hearing on White's posttrial motion and called Dr. Smith as a court's witness. Dr. Smith testified that he did not make up his mind about his new opinions until a few days before he testified. Earlier that day, Dr. Smith had gone to the medical library to consult some "rather esoteric articles" that helped him reach these new opinions. He called Garlock's counsel that day and discussed the matter with him. Dr. Smith explained that he had not finalized his preparation until that date because he thought he would be giving a discovery deposition, but that never happened. He also explained that this was the first case in which he had worked with any of the attorneys representing Garlock.

The night before Dr. Smith testified, he had dinner with Garlock's attorney and discussed the case. Dr. Smith explained that his recollection was not totally clear, but he recalled most of his preparation with Garlock's attorney dealt with whether Garlock gaskets and packing materials could have

- 13 -

caused or substantially contributed to decedent's asbestosis, if decedent indeed had had asbestosis. Dr. Smith had a vague recollection that the attorney indicated that he

> "probably would not be discussing with me in any degree of intensity anything about my opinion as to the actual cause of death or those sorts of things. And I told him I thought it would be hard to discuss the matter without talking about that a little bit. As a scientist and physician, you know, you also want to talk about the cause of death, but he said, well, you know, you probably will not be able to discuss those matters."

Dr. Smith testified that he was concerned that the White family was never going to hear about the potentially genetic disorder that predisposed them to aspergillosis. Garlock's attorney told him that he probably would not be able to discuss that during his testimony, "but we'll see if something can't be done about that after you testify."

Dr. Smith was asked whether anyone from Garlock's lawyers' firm advised him that he could not offer his opinion regarding aspergillosis at trial, and he responded as follows: "No, I don't believe that I was advised that I explicitly could not mention the opinion about aspergillosis at trial. As I've

- 14 -

mentioned, I was advised that that was not going to be the main thrust of my testimony."  Dr. Smith was also asked whether Garlock's attorneys ever warned him that any particular opinion was not to come out at trial, and he responded as follows:  "I don't recall [Garlock's] attorneys, any of them, telling me that I couldn't offer my honest opinions about any matter if it was appropriate to do so."

After Dr. Smith testified, Garlock conceded during argument on the motion that it knew disclosure of Dr. Smith's new opinions was patently late.  Garlock explained its counsel's conduct, as follows:

"He knew that the appropriate relief to be imposed upon Garlock was that Dr. Smith would not be allowed to offer [those opinions.]  We basically elected to impose that relief upon ourselves and instructed Dr. Smith that we weren't going to go down that route in his examination and left that issue out of the trial essentially.  Obviously, if that door were opened on cross-examination, that was beyond our control, and [if] Dr. Smith felt that it had been opened, we could not instruct him not to offer that opinion if it came up on cross-examination[,] of course."

The trial court pointed out that it had been laboring at trial under the assumption that the volunteered modified opinion that Dr. Smith offered on cross-examination was news to everyone, including Garlock, and that Garlock did not know about the new opinion prior to his offering it. The court added, "I'm having a hard time understanding *** why Garlock did not make clear to the court at that point in time that Garlock knew about this and what efforts it had taken, if any, prior to trial to keep [Dr. Smith] from stating undisclosed opinions." Garlock's first response was, "With all due respect, I don't know how the court reached that conclusion." The court retorted, "Well, I reached that conclusion because Garlock didn't tell me that they knew about it." Garlock then responded that it argued at the time its belief that the opinion had been adequately disclosed in Dr. Smith's February 2005 report. The court responded:

> "True enough, and I think I told you in the
> nicest and politest terms that a judge can
> use that that position was total nonsense
> since, of course, the newly proffered opinion
> on cross-examination in this case was a sig-
> nificant departure from [Dr. Smith's] prior
> opinion. *** [T]o say otherwise is just
> silly in my opinion."

Garlock also argued that the trial court needed to ask

itself what error occurred here and what could have been done to remedy the situation, adding, "No one could have told Dr. Smith that he could not offer [his opinions.]"  The court responded as follows:

> "[I]f this matter had been raised prior to [Dr. Smith's] testimony, if you had disclosed it to [White's counsel] and they raised this by motion, then the matter could have been resolved prior to [Dr. Smith's] testimony because the court could have instructed him what he could or could not get into in his testimony[,] and he would have to abide by that."

At the conclusion of the hearing, the trial court granted White's motion for a new trial, explaining, in part, as follows:

> "[T]he [c]ourt believes that it is crystal clear beyond any question that an egregious [Rule] 213 violation occurred in this matter. And it's just beyond me as to how that would not be the case. *** [W]e'll give [Dr. Smith] the benefit of the doubt and say yes he ex- pressed the opinion [in his February report] that [the deceased] had aspergillosis. ***

[However,] there's a whole lot of difference between saying he had aspergillosis and saying that he had aspergillosis and that was the cause of his death. There's a whole lot of difference between saying, as he did in his February report, I can't--I'm casting doubt on the asbestosis diagnosis, but I can't say to a reasonable degree of medical certainty one way or another whether he had it or he didn't have it. And turning around in [his] testimony and saying he did not have asbestosis and therefore obviously that's not the cause of his death. Aspergillosis is the cause of his death.

*** [Dr. Smith] didn't finalize his opinion until the very end right before he was about to testify. Once he did that, whether Garlock intended to use it, he was going to avoid it altogether[,] or whatever, Garlock was under an immediate obligation to update its [Rule] 213 disclosure Monday morning or Sunday evening to [White's counsel] indicating what the doctor's opinion was that was different than what was in his report.

The simple expedient of doing that would have avoided this entire problem in the first place.  ***

Garlock made a conscious decision to simply give some sort of warning to the doctor, which obviously was not effective, because in cross[-]examination he basically volunteered this information.  It was a nonresponsive answer.  Certainly was not--was not called for, and then at that point the [c]ourt dealt with it.

Well, Garlock's position now is that the way the [c]ourt dealt with the matter at the time was appropriate and was, if you will, a middle of the road moderate sanction but one that effectively dealt with it with the jury in effect being instructed to disregard something [it] had already heard.

That position ignores the fact *** it is likely that the [c]ourt would have looked at this matter significantly different[ly] had I known at that point in time that Garlock knew about the updated opinion.  The matter was not directly discussed, but the [c]ourt be-

- 19 -

lieves it was incumbent on Garlock to inform the [c]ourt that it knew about it and what steps it had taken to make sure the [d]octor didn't disclose something that was not in his report. And the [c]ourt was not informed of that, and I was laboring under the assumption that Garlock was surprised by all this as the rest of us were, and I--I just see no excuse for not disclosing in the first place and no excuse for not informing the [c]ourt what the situation was. In that event, the [c]ourt may well have taken a different approach. The [c]ourt might have barred the doctor's testimony altogether. The [c]ourt might have granted a mistrial. I don't know. But it's likely I would have taken more severe action had I known that Garlock had known about this matter before--before it came up.

\*\*\*

The real question is to me not whether a violation occurred or that things should have been done a lot different, but whether the violation merits a new trial, whether there was a fundamental denial here to Mrs. White

of a fair hearing, and how important was the matter involved here? *** [C]oming into this trial it would have appeared I think to [White] based on the evidence they had *** that whether [decedent] had asbestosis and whether that was the cause of his death was not the issue in the case.  That the issue in the case is whether Garlock products were at his workplace and whether they could conceivably have produced enough exposure that Garlock could be found liable for his disease and death.

The *** newfound opinion of [Dr. Smith] introduced before the jury a question on an extremely important issue in this case, whether he even had asbestosis in the first place and whether it could have caused his death.  The [c]ourt, based on what it knew at the time, took appropriate action to try to correct an error without declaring a mistrial or taking some more drastic action.

The [c]ourt would note for the record *** Dr. Smith in my view is an extremely able and effective expert witness and one who is

- 21 -

not only very articulate in terms of being able to convey things to laypeople but [who also has a] very likeable personality, and he was an important witness in this trial.

And the [c]ourt has agonized over this matter greatly. I think it goes without saying that this judge and no other judge lightly considers granting a new trial in any matter much less an extensive matter which requires great preparation and lengthy trial and many expert witnesses. But in this circumstance the [c]ourt believes that the importance of the issue involved here, the egregiousness of the violation and the failure to make the appropriate disclosures that we've discussed, is sufficient that [the m]otion for [n]ew [t]rial *** will be granted."

F. The Trial Court's Order Restricting Dr. Smith's Testimony Upon Retrial

After the trial court granted the motion for a new trial, the court also imposed restrictions upon Dr. Smith's testimony at the new trial, explaining as follows:

"[T]he manner in which this [situation was] handled makes it very difficult and problem-

- 22 -

atic to allow [White] to fairly cross[-]examine [Dr. Smith] at future trials, [so] the [c]ourt will bar his testimony at future trial related to the issue of [the decedent's] medical condition and the cause of [the decedent's] death.

The [c]ourt will leave open the option but entertain argument as to whether the problems created by all this should bar his testimony [on] the other issue that he testified on, which is whether Garlock products could have conceivably produced enough asbestos to--to have created any problem here. But as to that part of his testimony related to [the deceased] and his medical diagnosis and treatment and cause of his death, Dr. Smith will be barred on that side of the issue."

The trial court further clarified its ruling by indicating that it was not yet definitively ruling out any testimony by Dr. Smith at the new trial regarding, generally, "what it takes to have exposure and here's what [the decedent] had from the records I have[,] and therefore he didn't get enough exposure [from Garlock's products]" to cause decedent's illness.

G. Garlock's Motion To Reconsider the Grant of a New Trial

In August 2006, Garlock filed a motion to reconsider the trial court's grant of White's motion for a new trial, asserting the following: (1) even if a Rule 213 violation occurred, the jury's special findings conclusively established that it did not unfairly prejudice White or affect the outcome at trial; (2) White forfeited her right to seek a new trial based on Dr. Smith's purportedly improper opinions because she failed to promptly object or seek other relief; (3) White cannot object to testimony she elicited; and (4) if the new trial order is affirmed, Dr. Smith's testimony should not be limited upon retrial.

In September 2006, the trial court conducted a hearing on the motion to reconsider and denied it. During that hearing, the court asked Garlock, "Doesn't [White's] attorney have the expectation upon cross-examination *** that he is not going to hear a different answer [from Garlock's expert witness] than what's in the disclosure [Garlock provided regarding that expert's opinions]?" Garlock responded: "Pursuant to [s]upreme [c]ourt [r]ule, he has an expectation, and that's why most people will depose the expert to kind of make sure they don't walk into something like that." Garlock further implied that had White bothered to depose Dr. Smith, the problems pertaining to his testimony might have been avoided.

The trial court reiterated that in the report Dr. Smith

prepared prior to trial, he stated that he could not determine to a reasonable degree of medical certainty if the decedent did or did not have asbestosis and certainly gave no opinion that aspergillosis was the cause of his death.  The court noted that Garlock argued at trial that "somehow this was not a change of opinion, which the court didn't understand at the time and certainly doesn't understand now.  The doctor changed his opinion."  The court added the following:

> "[White] had an absolute right, in my view, to expect, once [the condition of the decedent's health] was testified about on direct [examination], that if [White] asked any questions that related to the health of [the decedent], that they would get exactly the opinions that were disclosed [in advance of trial by Dr. Smith], and they asked questions[,] and they did not get exactly the opinions that were disclosed."

The trial court explained that it deemed the Rule 213 violation serious because there are "only a couple of issues that are really important in an asbestos case, *** and one of them is did the person have some asbestos-related disease?"  Given the nature of the case White presented, the court thought that she would have believed that whether decedent's death was caused by

asbestos-related disease "was a nonissue," at least until Dr. Smith's cross-examination testimony. The court reaffirmed that, in its judgment, that testimony--namely, that the decedent did not have asbestosis in Dr. Smith's opinion--resulted from nonresponsive answers. The court also reaffirmed its view that Garlock's counsel "absolutely had the obligation" to inform the court that he knew in advance of Dr. Smith's change of opinion and, further, to have made an immediate disclosure of the change at the earliest possible time.

The trial court emphasized again that a factor in its decision to grant White's motion for a new trial was that Dr. Smith "was an extremely effective witness, *** one of the finest expert witnesses I have ever seen on the witness stand in 30 years." The court was concerned that some of the jurors may have answered the special interrogatory the way they did because they were thinking, based in part upon Dr. Smith's testimony, "I'm not even sure that the guy had asbestosis, but I'll go ahead and vote this way."

As earlier stated, Garlock filed a petition for this court to review the trial court's grant of White's motion for a new trial, and in September 2006, this court granted Garlock's petition.

## II. ANALYSIS

### A. Supreme Court Rule 213

Garlock first argues that the trial court erred by finding that a Rule 213(i) violation occurred. Garlock further argues that, even if such a violation did occur, (1) White forfeited this issue by not making a timely objection at trial and (2) White elicited the allegedly improper testimony herself. For the reasons that follow, we disagree.

#### 1. Standard of Review

In <u>Sullivan v. Edward Hospital</u>, 209 Ill. 2d 100, 108-09, 806 N.E.2d 645, 651 (2004), the supreme court reviewed the trial court's decision to strike certain testimony of the plaintiff's expert witness because of a violation of Rule 213 in a medical-malpractice case. In so doing, the court wrote as follows: "The admission of evidence pursuant to Rule 213 is within the sound discretion of the trial court, and the court's ruling will not be disturbed absent an abuse of that discretion." <u>Sullivan</u>, 209 Ill. 2d at 109, 806 N.E.2d at 651.

In this case, the trial court granted White's motion for a new trial because it found that Garlock violated Rule 213(i). Although this ruling was not, as in <u>Sullivan</u>, made during the course of trial, we conclude that the abuse-of-discretion standard is appropriate when reviewing a trial court's grant of a new trial based upon a Rule 213 violation.

- 27 -

## 2. Rule 213 and the Policy Underlying the Rule

Supreme Court Rule 213, entitled "Written Interrogatories to Parties," governs discovery by interrogatories, as well as disclosure of the identity of witnesses who will testify at trial. 210 Ill. 2d R. 213. Rule 213(f) requires a party, in response to a written interrogatory (as occurred in this case), to furnish information about three different categories of witnesses the party may call to testify at trial: (1) lay witnesses, (2) independent expert witnesses, and (3) controlled expert witnesses. Rule 213(f)(3) defines a "controlled expert witness" as follows:

> "A 'controlled expert witness' is a person giving expert testimony who is the party, the party's current employee, or the party's retained expert. For each controlled expert witness, the party must identify: (i) the subject matter on which the witness will testify; (ii) the conclusions and opinions of the witness and the bases therefor; (iii) the qualifications of the witness; and (iv) any reports prepared by the witness about the case." 210 Ill. 2d R. 213(f)(3).

The importance of a party's compliance with Rule 213(f)(3) is shown by Rule 213(g), which provides, in pertinent

- 28 -

part, as follows:  "The information disclosed in answer to a Rule 213(f) interrogatory *** limits the testimony that can be given by a witness on direct examination."  210 Ill. 2d R. 213(g).

Rule 213(i), which is at issue in this case, reads as follows:

> **"(i) Duty to Supplement**.  A party has a duty to seasonably supplement or amend any prior answer or response whenever new or additional information subsequently becomes known to that party."  210 Ill. 2d R. 213(i).

The Committee Comments to Rule 213 provide insight into what the Supreme Court of Illinois sought to achieve by promulgating the rule.  Committee Comments pertinent to this case discuss paragraph (i), as follows:

> "With regard to paragraph (i), the new rule imposes a 'seasonable' duty to supplement or amend prior answers when new or additional information becomes known to that party.  This is a change from previous discovery requirements and thus eliminates the need for supplemental interrogatories unless different information is sought.  The Committee believes that the definition of 'seasonable' varies by the facts of each case and by

the type of case, but in no event should it allow a party or an attorney to fail to comply with the spirit of this rule by either negligent or wilful noncompliance."  210 Ill. 2d R. 213(i), Committee Comments, at lxxxv.

In deciding whether the trial court erred by finding Garlock violated Rule 213, it is helpful to consider the underlying policy of that rule.  The Sullivan case is particularly instructive, where the supreme court stated that Rule 213(g)

"requires that, upon written interrogatory, a party must disclose the subject matter, conclusions, opinions, qualifications, and all reports of a witness who will offer any opinion testimony.  [Citation.]  Further, Supreme Court Rule 213(i) imposes on each party a continuing duty to inform the opponent of new or additional information whenever such information becomes known to the party."  (Emphasis in original.)  Sullivan, 209 Ill. 2d at 109, 806 N.E.2d at 651.

The Sullivan court then explained that its rules represented the court's best efforts to manage the complex and important process of discovery.  Of particular significance to this case, the supreme court added the following:

- 30 -

"Rule 213 permits litigants to rely on the disclosed opinions of opposing experts and to construct their trial strategy accordingly. [Citation.] *** One of the purposes of Rule 213 is to avoid surprise. [Citation.] To allow either side to ignore Rule 213's language defeats its purpose and encourages tactical gamesmanship." Sullivan, 209 Ill. 2d at 109-10, 806 N.E.2d at 652.

In Department of Transportation v. Crull, 294 Ill. App. 3d 531, 538-39, 690 N.E.2d 143, 148 (1998), this court addressed the then-newly revised version of Rule 213 and wrote the following:

"Rule 213 establishes more exacting standards regarding disclosure than did Supreme Court Rule 220 [citation], ***, which formerly governed expert witnesses. Trial courts should be more reluctant under Rule 213 than they were under former Rule 220 (1) to permit the parties to deviate from the strict disclosure requirements, or (2) not to impose severe sanctions when such deviations occur. Indeed, we believe one of the reasons for new Rule 213 was the need to require stricter

adherence to disclosure requirements."

In Sullivan, the supreme court quoted this portion of our decision in Crull and wrote, "We agree." Sullivan, 209 Ill. 2d at 110, 806 N.E.2d at 652.

We acknowledge that Rule 213 was amended, effective July 1, 2002, and that both this court in Crull and the supreme court in Sullivan were addressing the preamended version of that rule. Nonetheless, we do not believe the amendment to Rule 213 undermines the previously stated policy underlying Rule 213. We find support for this holding in the scholarly opinion of Justice Quinn in Kim v. Mercedes-Benz, U.S.A., Inc., 353 Ill. App. 3d 444, 454, 818 N.E.2d 713, 721 (2004), where the First District addressed a postamendment Rule 213 violation and cited Sullivan (citing Crull) for the proposition that "[t]o allow either side to ignore the plain language of Rule 213 defeats its purpose and encourages tactical gamesmanship." See also Foley v. Fletcher, 361 Ill. App. 3d 39, 47, 836 N.E.2d 667, 674 (2005) (addressing the 2002 amended version of Rule 213 and citing the policy discussions of Sullivan as authoritative).

3. The Trial Court's Finding That Garlock Violated Rule 213(i)

The record is clear that Dr. Smith was a controlled expert witness under Rule 213(f)(3). That status required Garlock, in response to White's interrogatories, to not only identify Dr. Smith as one of the witnesses Garlock expected to

testify at trial, but also to identify "the conclusions and opinions of [Dr. Smith] and the bases therefor." 210 Ill. 2d R. 213(f)(3)(ii).

The trial court determined that Garlock violated Rule 213(i) because Garlock did not "seasonably supplement or amend any prior answer or response" by Dr. Smith in response to White's interrogatory when new information subsequently became known to Garlock.

Garlock first argues that the trial court erred by finding it violated Rule 213(i). Specifically, Garlock contends that because its direct examination of Dr. Smith did not deviate from its Rule 213 disclosures regarding his testimony, no violation of Rule 213(i) occurred. We disagree.

At the hearing on the motion to reconsider the trial court's grant of White's motion for a new trial, the court stated well the fundamental issue in this case:

"Doesn't [White's] attorney have the [right to an] expectation upon cross-examination *** that he is not going to hear a different answer [from Garlock's expert witness] than what's in the disclosure [Garlock provided regarding that expert's opinions]?"

Consistent with the earlier-discussed policy underlying Rule 213, we agree with the trial court that the answer to this question is

an emphatic "yes."

The plain language of Rule 213 compels this conclusion. First, Rule 213(f)(3) states, in pertinent part, that a party must identify the "conclusions and opinions" of that party's "controlled expert witnesses," and contains no language limiting the disclosure to "conclusions and opinions" that the party expects to elicit on direct examination. Second, Rule 213(i) similarly speaks of a party's "duty to seasonably supplement or amend" any prior answer or response to an interrogatory whenever new or additional information subsequently becomes known to that party. 210 Ill. 2d R. 213(i). Rule 213(i) contains no language limiting the duty to supplement discovery to material that the party expects to elicit on direct examination. To limit Rule 213's applicability in this way would be inconsistent with the supreme court's intent in promulgating Rule 213 and would encourage the sort of "tactical gamesmanship" that the rule was intended to prevent.

We agree with the sentiments expressed in Clayton v. County of Cook, 346 Ill. App. 3d 367, 381, 805 N.E.2d 222, 235 (2003): "'Rule 213 is designed to give those involved in the trial process a degree of certainty and predictability that furthers the administration of justice and eliminates trial by "ambush".' [Citations.]" In this case, Garlock knew of the change in Dr. Smith's opinion (concerning one of the most funda-

- 34 -

mental issues in the case) and violated Rule 213(i) by failing to reveal this change to White. Instead, Garlock mutely stood by as White conducted a vigorous cross-examination during which Dr. Smith's new opinions came out. This is precisely the sort of ambush that Rule 213 was designed to prevent. The bottom line is that White had an absolute right to conduct her cross-examination of Dr. Smith with confidence that she knew all of his pertinent opinions because Garlock had disclosed them in response to her written interrogatories.

### 4. Garlock's Claim That White Forfeited Her Rule 213(i) Argument Because She Did Not Timely Object

Garlock also argues that White forfeited at trial the issue of any Rule 213(i) violation by failing to timely object or seek a new trial based on the alleged violation. Specifically, Garlock contends that after Dr. Smith revealed his new opinions, White proceeded to pose additional questions to Dr. Smith instead of objecting, and these questions served "not only to underscore, but to expand the scope" of the opinions Dr. Smith was then presenting. We are unpersuaded.

Garlock is correct that, generally, to be effective in preserving an error, an objection must be timely, meaning contemporaneous with the objectionable conduct. York v. El-Ganzouri, 353 Ill. App. 3d 1, 17, 817 N.E.2d 1179, 1194 (2004). In People v. Stewart, 343 Ill. App. 3d 963, 979, 799 N.E.2d 1011, 1024 (2003), the appellate court explained that this forfeiture rule

serves an important purpose because a timely objection will allow the trial court to correct any errors.  However, like most rules dealing with the admissibility of evidence, the issue of the timeliness of a party's objection is left to the sound discretion of the trial court.  Here, White raised the alleged Rule 213(i) violation at her first opportunity to do so out of the presence of the jury when the court ordered a recess in normal course.  When considered in context, the trial court was not troubled by any delay in White's raising the issue at that time.  Neither are we.

### 5. <u>Garlock's</u> <u>Claim</u> <u>That</u> <u>White</u> <u>Cannot</u> <u>Object</u> <u>to</u> <u>Testimony</u> <u>She</u> <u>Elicited</u>

Garlock next argues that "[a] fundamental flaw in the rationale underlying the trial court's decision to grant [White] a new trial" is that White elicited the opinions of Dr. Smith that allegedly violated Rule 213.  Garlock contends that because White elicited this purportedly improper opinion testimony, she cannot complain about its admission.

We reject this argument for two reasons.  First, we agree with the trial court that the new opinions expressed by Dr. Smith on cross-examination were volunteered and not responsive answers to questions asked by White.  Accordingly, it cannot be said that White "elicited" Dr. Smith's new opinions.

Second, even if White had done so, it would not have mattered.  As we explained earlier, White had an absolute right

to conduct her cross-examination of Dr. Smith in the confidence that she knew all of his pertinent opinions regarding the case. Garlock had the duty under Rule 213(i) to make that right a reality.

In support of its argument, Garlock cites <u>Nassar v. County of Cook</u>, 333 Ill. App. 3d 289, 303-04, 775 N.E.2d 154, 166 (2002), in which the plaintiff in a medical-malpractice action argued that the defendant's expert witness testified improperly, but the appellate court held "Plaintiffs cannot object where they first elicited the testimony during their examination of [defendant's expert]." However, Garlock does not mention <u>the</u> <u>very</u> <u>next</u> <u>sentence</u> that reads as follows: "Moreover, [defendant's expert's] testimony did not involve new opinions ***." <u>Nassar</u>, 333 Ill. App. 3d at 304, 775 N.E.2d at 166-67.

B. The Remedy for Garlock's Rule 213(i) Violation

1. <u>The</u> <u>Grant</u> <u>of</u> <u>a</u> <u>New</u> <u>Trial</u>

Garlock next argues that even if a Rule 213(i) violation occurred, the trial court erred by ordering a new trial as a remedy. Specifically, Garlock contends that "the jury's special findings conclusively demonstrate that [the violation] did not affect the trial's outcome, prejudice [White], or deny her a fair trial." Accordingly, Garlock claims that the court's grant of a new trial constituted an abuse of discretion. We disagree.

We first note that in reviewing the issues of (1)

whether a Rule 213(i) violation occurred and, (2) if so, what remedy should be imposed, we are struck by the obvious care and consideration the trial court gave to both of these issues. In particular, we commend the trial court for its extensive discussion with trial counsel during which the court sought to learn as much as it could about what really happened. Too frequently, courts of review are left with uncertainties when discovery issues are argued on appeal because the trial court did not make a complete record. We are fortunate that did not occur in this case.

We also commend the trial court for taking the unusual step of calling Dr. Smith as a court's witness to make clear (1) the context in which his new opinions were developed, (2) his discussions with Garlock's counsel, and (3) how he happened to testify about his new opinions at trial. Calling Dr. Smith as a court's witness was an unusual step, but the court was confronted with an extraordinary situation, and it acted appropriately.

The record also reveals that the trial court carefully considered all pertinent matters before granting White's motion for a new trial. The court explained at length the circumstances as it found them and why it felt compelled to take that action. We earlier explained that this decision was a matter left to the court's sound discretion, and we reject Garlock's argument that the court abused its discretion by ordering a new trial.

- 38 -

In so concluding, we also reject Garlock's argument that the jury's special findings conclusively established that the Rule 213(i) violation did not unfairly prejudice White or affect the trial's outcome.  Garlock bases this argument upon its contention that the special findings

> "conclusively establish that the jury did not
> base its decision in whole or in part on the
> testimony found to violate Rule 213.  First,
> the jury found that [the] decedent's exposure
> to Owens Corning Kaylo, an asbestos-contain-
> ing thermal insulation product, was a proxi-
> mate cause of his injury and death.  That is,
> the jury found that decedent suffered from
> asbestosis.  Second, the jury found that
> Garlock's products were not a proximate cause
> of [the] decedent's asbestosis and death.
> The jury's special findings support only two
> possible conclusions:  the jury rejected Dr.
> Smith's opinion that aspergillosis caused
> [the] decedent's death, or it heeded the
> court's instruction to disregard it."

We disagree with Garlock's analysis.  Instead, we agree with the trial court's determination that Dr. Smith's new opinions, which constituted the Rule 213(i) violation and which came

forth during his cross-examination, were so potentially prejudicial that granting White a new trial was entirely appropriate. When, as here, a jury has heard improper evidence, a trial court always possesses the authority to award a new trial to the injured party, no matter what special findings the jury may have made. The trial court is in the best position to determine to what extent the improper evidence may have affected the decisions of the jury, including any special findings. Garlock's argument to the contrary is groundless, and the authority Garlock cites is completely inapposite.

2. <u>Restrictions</u> <u>on</u> <u>Dr.</u> <u>Smith's</u> <u>Testimony</u> <u>on</u> <u>Retrial</u>

In granting White's motion for a new trial, the trial court also restricted Dr. Smith from testifying at the new trial "on the issues of the diagnosis of any medical condition from which [decedent] suffered and the cause of [decedent's] death." The court left open the question of whether Dr. Smith would be permitted to render opinions on the ability of Garlock products to cause asbestos disease in general.

Garlock argues that if this court affirms the trial court's grant of White's motion for a new trial, then we should lift the restrictions on Dr. Smith's testimony on retrial. Garlock specifically contends that prohibiting Dr. Smith from rendering opinions about decedent's medical condition and the cause of his death will "prevent--rather than ensure--a trial on

the merits."  Garlock further contends that the restrictions are excessive and unnecessary because, at any retrial, White will have "knowledge of the opinions and may seek to conduct additional discovery."  We disagree.

Garlock is correct that Illinois recognizes a strong public policy favoring trials on the merits whenever possible. Here, the trial court's granting of a new trial was similar to other actions courts have taken pursuant to Rule 219 (166 Ill. 2d R. 219) when discovery violations occurred before or during trial.  The only difference is that this case was over, and the jury had rendered its verdicts.  Despite this difference, we look to Rule 219 and the case law interpreting that rule for guidance in reviewing the trial court's restrictions on Dr. Smith's testimony on retrial.  On this issue, in addition to the earlier cases we have mentioned, we have also considered <u>Shimanovsky v. General Motors Corp.</u>, 181 Ill. 2d 112, 123, 692 N.E.2d 286, 291 (1998); <u>Cirrincione v. Westminster Gardens Ltd. Partnership</u>, 352 Ill. App. 3d 755, 765, 816 N.E.2d 730, 738 (2004); and <u>Adams v. Bath & Body Works, Inc.</u>, 358 Ill. App. 3d 387, 395, 830 N.E.2d 645, 653 (2005).

We have already ruled that the trial court was correct to find Garlock violated Rule 213(i) by not timely disclosing Dr. Smith's new opinions.  The court's grant of White's motion for a new trial certainly constitutes significant punishment for that

sin, given that White asked for $3 million in damages, and the jury found in favor of Garlock and awarded White nothing. We are also sensitive to the fact that this was a lengthy, complex, and expensive trial the conclusion of which was aborted because of Garlock's violation of Rule 213(i). After carefully considering the competing interests pertaining to restrictions on Dr. Smith's testimony on retrial, and being guided by the provisions of Rule 219 and the case law interpreting it, we conclude that the trial court did not abuse its discretion by imposing those restrictions.

### C. White's Claim That Garlock's Intentional Violations of Rules 213(i) and 237(b) Require the Entry of Judgment Against Garlock on Liability and Causation and a New Trial on Damages Only

As earlier noted, this case is before us on appeal pursuant to Rule 306, which permits a party to petition for leave to appeal to this court from an order of the circuit court granting a new trial. The last paragraph of Rule 306(a) provides as follows: "If the petition for leave to appeal an order granting a new trial is granted, all rulings of the trial court on the posttrial motions are before the reviewing court without the necessity of a cross-petition." 210 Ill. 2d R. 306(a). Pursuant to that paragraph, White argues that Garlock not only violated Rule 213(i) but also Rule 237(b) (210 Ill. 2d R. 237(b)), and that these intentional violations require the entry of judgment against Garlock on liability and causation and a new

- 42 -

trial on damages only.  We disagree.

One month before the November 2005 jury trial, White served Garlock with a notice under Rule 237(b) requesting, among other things, that Garlock produce Dr. David Carlson to testify at trial.  Garlock moved to quash the notice, arguing that Dr. Carlson was not then and never had been an employee, officer, or director of Garlock.  The matter was extensively argued before the trial court, which ultimately agreed with White that although Dr. Carlson was not an employee, officer, or director of Garlock, he was in a similar position because of his perceived economic relationship with Garlock.

When Garlock did not produce Dr. Carlson to testify at trial, the trial court instructed the jury at the close of White's case in chief about that failure, explaining, in pertinent that:  "Despite the [c]ourt's order, Garlock has failed to produce Dr. Carlson and has failed to offer an explanation for his absence acceptable to the court.  You will receive further instruction at the conclusion of the case related to this issue."

At the conclusion of the case, the trial court instructed the jury as follows:

> "If a party to this case has failed to offer
> evidence within its power to produce, you may
> infer that the evidence would be adverse to
> that party if you believe each of the follow-

ing elements:

1. The evidence was under control of the party and could have been produced by exercising reasonable diligence.

2. The evidence was not equally available to an adverse party.

3. A reasonably prudent person under the same or similar circumstances would have offered the evidence if it believed it to be favorable.

4. No reasonable excuse for the failure has been shown."

In White's posttrial motion, she raised the issue of Garlock's failure to produce Dr. Carlson. The trial court concluded that the sanction it entered against Garlock was sufficient, noting that White did not take Dr. Carlson's deposition nor provide the court with information it could use to determine that Dr. Carlson's testimony would have in fact been important.

We earlier mentioned the obvious care and consideration the trial court gave to the Rule 213(i) issue in this case, and we are equally impressed regarding the court's handling of the Rule 237(b) issue. Like other discovery issues, the appropriateness of any sanction for a violation of Rule 237(b) is left to

the sound discretion of the trial court.  We conclude that the trial court did not abuse its discretion on this matter, and accordingly, we decline to grant White the additional relief she has requested on appeal.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's grant of White's motion for a new trial.

Affirmed.

MYERSCOUGH and COOK, JJ., concur.