# Illinois Official Reports

## Appellate Court

---

### *Fakes v. Eloy*, 2014 IL App (4th) 121100

---

| | |
|---|---|
| Appellate Court Caption | MARY FAKES, as Special Administratrix for the Estate of Laura Alice Powell, Deceased, Plaintiff-Appellant, v. VICTOR ELOY, M.D.; and INTERNAL MEDICINE SUBSPECIALTY ASSOCI-ATES, LTD., Defendants-Appellees. |
| District & No. | Fourth District<br>Docket No. 4-12-1100 |
| Filed | March 12, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a medical malpractice action alleging that the treatment defendant provided to plaintiff's decedent for bleeding esophageal varices did not comport with the medical standard of care, the verdict for defendant was reversed and the cause was remanded for a new trial, since the record showed that the critical issue in the case was the cause of decedent's death and defendant violated Supreme Court Rule 213 by stating in his deposition that decedent's death was caused by bleeding esophageal varices but, at trial, he testified that he was not sure what caused her death, that "some other" nonspecific factors contributed to her death and that bleeding esophageal varices were not the cause of her death, and defendant's failure to supplement or amend his deposition testimony constituted a violation of Rule 213 warranting reversal. |
| Decision Under Review | Appeal from the Circuit Court of Macon County, No. 06-L-183; the Hon. Thomas E. Little, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |

Counsel on
Appeal

Lisa Corwin (argued), of Wylder Corwin Kelly LLP, of Bloomington, for appellant.

Charles C. Hughes (argued) and Katie W. Baggett, both of Hughes & Tenney, L.L.C., of Decatur, for appellees.

Panel

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices Pope and Holder White concurred in the judgment and opinion.

**OPINION**

¶ 1    In November 2006, plaintiff, Mary Fakes, as special administratrix for the estate of Laura Alice Powell, deceased, filed a medical malpractice suit against defendants, Victor Eloy, M.D., and his principal, Internal Medicine Subspecialty Associates, Ltd. (hereinafter, defendants or Eloy). In March 2012, a jury returned a verdict in Eloy's favor.

¶ 2    Fakes appeals, arguing that the trial court (1) erred by failing to impose sanctions against Eloy for violating Illinois Supreme Court Rule 213 (eff. Jan. 1, 2007) and (2) abused its discretion by admitting (a) evidence under the rule of completeness, (b) the testimony of two medical experts with whom defense counsel purportedly engaged in prohibited *ex parte* communications in violation of the doctrine announced in *Petrillo v. Syntex Laboratories, Inc.*, 148 Ill. App. 3d 581, 499 N.E.2d 952 (1986) (*Petrillo* doctrine), (c) hearsay evidence, and (d) evidence the court had barred. Fakes also argues that the court violated her right to a fair trial by refusing to strike four prospective jurors for cause. For the reasons that follow, we reverse and remand.

¶ 3                          I. BACKGROUND
¶ 4                          A. Prologue
¶ 5    On November 26, 2004, decedent, who was 63 years old, sought emergency medical care because she had earlier vomited a considerable amount of blood. The following morning, she died as a result of bleeding veins in her esophagus (a condition known as bleeding esophageal varices). Fakes sued, claiming that the care Eloy provided to decedent did not comport with the medical standard of care. The jury later returned a verdict in Eloy's favor.

¶ 6    Because Fakes' claims concern multiple issues that occurred before and during the six-day trial in this case, and given the length of the record in this case, we limit our discussion to the facts necessary to place the parties' arguments in context.

## B. *Voir Dire*

At the beginning of jury selection, the trial court identified by name potential witnesses who were expected to testify, including Eloy, decedent's gastroenterologist, and George Duncan, decedent's primary care physician. After providing the venire a brief description of the nature of the case, the court asked a series of typical *voir dire* questions to a panel of 14 veniremembers. The court then permitted the parties to pose questions to the panel and specific veniremembers. The court and parties would then adjourn to the judge's chambers to discuss the panel at issue. In this case, the aforementioned process was repeated with three panels–each comprised of 14 veniremembers–to empanel a 12-member jury.

### 1. *The First Venire Panel*

During questioning of the first panel, Fakes' counsel asked for a show of hands to the question, "Who doesn't like lawsuits?"

Veniremember A opined that we live in a litigious society, adding, "I think everybody is very quick to want to go to court." Counsel then asked whether veniremember A had a bias against lawsuits, and he responded, "if there is justification, I think it's okay. But sometimes I think that *** they're too quick to file and sometimes there's not any merit there." Veniremember B expressed her "strong" belief that "more and more everybody is just finding ways to go to court just to get money." Veniremember B did not believe she had a bias against litigation but was merely noting that it was increasing. Veniremembers A and B agreed that Fakes' suit "start[s] off a little bit behind" because of their respective opinions. Despite their beliefs, both stated that they would decide the case based on the evidence presented.

Fakes later moved to strike veniremembers A and B for cause, noting their attitude toward lawsuits and their belief that Fakes' suit starts out behind. Eloy objected, noting the responses the veniremembers expressed regarding their specific roles as jurors as opposed to their general beliefs on litigation. The trial court denied Fakes' motions to strike for cause. Thereafter, Fakes used two of her five peremptory challenges to dismiss both veniremembers.

### 2. *The Second Venire Panel*

Veniremember C, a registered nurse, knew both Eloy and Duncan because she had cared for their hospital patients. She characterized both as "good doctors" and said her relationships with Eloy and Duncan would not affect her impartiality. Veniremember D, a molecular biologist, (1) baby-sat the children of Eloy's counsel "years ago" and (2) worked with Eloy on a medical-research project. Although veniremember D had formed an opinion of both men, she stated that she could set aside those personal opinions and decide the case on the facts presented.

Fakes later moved to strike both veniremembers C and D, citing their respective relationships. Eloy objected, arguing that both veniremembers clearly stated they would be impartial jurors. The trial court denied Fakes' motions to strike for cause. Fakes responded by using a third peremptory challenge to dismiss veniremember C.

### 3. *The Third Venire Panel*

¶ 17    After answering questions that the trial court posed to the entire panel, veniremember G.M. informed Fakes that she could award $500,000 if the law and evidence supported such a verdict. During Eloy's questioning, G.M. explained that she had recently retired from her job as a bookkeeper in Decatur Township's welfare division.

¶ 18                              4. *The Composition of the Jury*

¶ 19    During consideration of the third panel, the trial court informed the parties that eight veniremembers had been selected as jurors and four selections remained. When the trial court tendered to Fakes four possible jurors, one of whom was veniremember D, Fakes used her fourth peremptory challenge to dismiss her. Fakes then used her fifth–and final–peremptory challenge to dismiss veniremember D's replacement. Eloy then used a peremptory challenge to dismiss a veniremember that the court then replaced with G.M. Eloy accepted the four veniremembers tendered. Fakes' counsel responded, as follows:

> "I want to make a record that I would have struck *** [G.M.] if I had another peremptory because I would have used one of my perempts [*sic*] on her. *** I understand I don't have one, but I want to make a record on that. I never did accept that panel."

¶ 20              C. The Pertinent Trial Evidence Presented by the Parties
¶ 21                                1. *Fakes' Evidence*

¶ 22    Fakes called Eloy to testify as an adverse witness in her case in chief. Eloy, a board-certified physician in internal medicine and gastroenterology, testified that on November 22, 2004, five days before decedent died, he examined her by performing an upper endoscopy and a colonoscopy. An upper endoscopy is a procedure that enables a physician to view the esophagus, stomach, and portions of the small bowel using a thin, flexible scope inserted through the mouth. The colonoscopy allows examination of the colon by inserting a different type of scope through the anus.

¶ 23    Eloy's preoperative diagnosis was that decedent suffered from "[c]irrhosis of the liver secondary to hepatitis C." Eloy explained that in the mid-1980s, decedent contracted hepatitis C from a blood transfusion. In his November 22, 2004, operative report, documenting the results of his separate endoscopy procedures, Eloy diagnosed decedent with a "[g]rade II [of IV] esophageal [varices]." Eloy confirmed that bleeding esophageal varices can cause death if the blood flow is not stopped by performing an endoscopic variceal banding procedure. Eloy acknowledged that some physicians perform the banding procedure even when the esophageal varices are not bleeding.

¶ 24    On November 26, 2004, decedent called Duncan, complaining of vomiting "a large amount of blood." Duncan advised her to go to the Decatur Memorial Hospital emergency room (ER). When she arrived, ER personnel notified Eloy. At about 11:30 p.m., Eloy examined decedent. That examination revealed that decedent had bled from her gastrointestinal tract. Eloy opined that decedent's esophageal varices had bled earlier but had stopped bleeding by the time he examined her because decedent was not (1) vomiting blood, (2) passing blood clots through the rectum, or (3) experiencing "dark tarry stools," which were symptoms of such a condition. Eloy also noted that decedent's grade II esophageal varices were small, which would not create

enough pressure to cause a rupture. Eloy did not perform an upper endoscopy on decedent, which he admitted would have confirmed whether bleeding was occurring.

¶ 25    Because decedent was stable at that time, Eloy prescribed medication to slow decedent's blood flow, ordered decedent's transfer to the intensive care unit (ICU), and scheduled an "endoscopic evaluation *** with variceal banding" for 10:30 a.m. the following day. In his consultation report, Eloy diagnosed decedent, in part, with "[g]astrointestinal bleed suspect secondary to esophageal [varices]." Eloy then returned home.

¶ 26    At approximately 1:30 a.m. on November 27, 2004, ER personnel called Eloy at his home and informed him that decedent had "developed some abdominal pain." Eloy prescribed the medication Demerol. At 5:08 a.m. that same day, ICU personnel called Eloy and informed him that decedent was allergic to Demerol and that her blood hemoglobin count had dropped from 10.4–when Eloy examined her in the ER–to 6.2, which the testing technician annotated was a "panic level" measurement. Upon learning of decedent's hemoglobin count, Eloy suspected that she had been bleeding since 2 a.m. Eloy prescribed morphine, ordered a blood transfusion, and realized that he would have to immediately perform the endoscopic variceal banding procedure. Five minutes later, Eloy called the ICU and ordered an X-ray of decedent's abdomen. Eloy suspected that some other medical issue was occurring because decedent was not exhibiting the aforementioned symptoms of bleeding esophageal varices. Eloy then showered, trimmed his beard, and dressed, which he estimated took half an hour.

¶ 27    At 7:30 a.m. on November 27, 2004, decedent had a "massive [gastrointestinal] bleed." At 8:15 a.m., Duncan, who had responded to the ICU's emergency "code blue," informed decedent's family that her medical condition was grave. At 8:21 a.m., decedent died. At 11:40 a.m., Eloy entered a physician's progress note, confirming that he had dictated a final summary of decedent's condition. Eloy admitted that he arrived at the hospital sometime after decedent died. Eloy's final diagnosis of decedent's condition was a "massive upper gastrointestinal bleed presumed secondary to esophageal varices."

¶ 28    During Fakes' examination of Eloy, the following exchange occurred:

"[FAKES' COUNSEL]: What is your opinion as to a reasonable degree of medical certainty as to the cause of [decedent's] death?

[ELOY]: I'm not exactly sure what caused her death. I believe that variceal bleed had something to do with it. But the clinical presentation, something happened to [decedent] around two o'clock in the morning that changed the clinical picture entirely. ***

[FAKES' COUNSEL]: Page 41. Do you remember being asked this question and giving this answer at your [August 2008 discovery] deposition: 'Q[uestion]: So to a reasonable degree of medical certainty, you believe the esophageal varices bleed caused her death? A[nswer]: Yes.'

[ELOY]: If you read other parts of the deposition, I also mention that there was [*sic*] some other factors that contributed to her death. I wasn't specific. I did say that something else happened. ***

* * *

[FAKES' COUNSEL]: *** In order for an opinion to be–I don't know what [the] word would be–

[ELOY]: Accepted.

- 5 -

[FAKES' COUNSEL]: Accepted. It needs to be a reasonable degree of medical certainty. You're familiar with that concept, right?

[ELOY]: I am.

[FAKES' COUNSEL]: Not 100[%] certainty, but the reasonable degree of medical certainty with which you practice medicine; do you understand that concept?

[ELOY]: I do understand that concept.

[FAKES' COUNSEL]: And I had the opportunity at your deposition to ask you to a reasonable degree of medical certainty what did you think caused [decedent's] death. What was your answer?

[ELOY]: Esophageal varices.

[FAKES' COUNSEL]: It was the bleeding of those esophageal varices that caused her death, right?

[ELOY]: *** I think it contributed to her death, but not the cause of her death.

[FAKES' COUNSEL]: Doctor, do you remember being asked this question, 'So to a reasonable degree of medical certainty, you believe the esophageal varices bleed caused her death, correct? A[nswer]: Yes.'

[ELOY]: My answer was yes.

[FAKES' COUNSEL]: Is it still your answer today that it's your opinion to a reasonable degree of medical certainty the esophageal varices bleed cause [decedent's] death?

[ELOY]: It is correct that it caused her death, but there [were] other circumstances as I do mention later on in the deposition that you took that you are not reading that I say that there [were] other contributing factors. The reason I say that is because her clinical picture changed.

[FAKES' COUNSEL]: What is this mysterious other thing that you believed occurred?

[ELOY]: The differential diagnosis is quite extensive. You want me to go through them, I will be happ[y] to.

[FAKES' COUNSEL]: Just tell me what you told me at your deposition about this mysterious [thing]. You're saying that you told me at the deposition. What other cause of death did you mention at your deposition?

[ELOY]: I did not mention any other cause of death in the deposition."

The trial court then granted Eloy's request for a sidebar conference. Following that conference, Fakes resumed her examination of Eloy, as follows:

"[FAKES' COUNSEL]: Back to where we were ***, when you were asked at your deposition to a reasonable degree of medical certainty what caused [decedent's] death, you said it was your opinion it was esophageal varices that bled that caused [decedent's] death; is that true?

[ELOY]: Yes.

[FAKES' COUNSEL]: You did not identify anything else at your deposition that you had an opinion to a reasonable degree of medical certainty or you had opinion otherwise caused her death, did you?

[ELOY]: It did not come up, no.

- 6 -

[FAKES' COUNSEL]: Is that a no then? You didn't offer that testimony?

[ELOY]: That's a no."

(The record shows that during a sidebar conference, the trial court overruled Fakes' objection that Eloy's testimony violated Illinois Supreme Court Rule 213 (eff. Jan. 1, 2007). The court, however, later permitted Fakes to make a record of that objection outside of the jury's presence, which the court denied. We will review and consider the pertinent portions of that hearing during our analysis of Fakes' Rule 213 claim.)

¶ 29 Thereafter, Fakes, referring to a medical article Eloy relied on in preparation for his August 2008 discovery deposition, asked whether Eloy agreed that a 20% chance of death exists even if an endoscopic variceal banding procedure is performed on a patient with bleeding esophageal varices. The following exchange occurred. (To provide clarity for the following quote, a "Child-Pugh" score predicts risk of surgical outcomes in patients with bleeding esophageal varices. Jeffrey D. Wayne *et al.*, *Preoperative Predictors of Survival After Resection of Small Hepatocellular Carcinomas*, 235(5) Annals of Surgery, at 722-31 (2002)):

"[FAKES' COUNSEL]: Do you agree with the fact that 20[%] can die, but the statistics show 80[%] percent live?

[ELOY]: It's how you read and interpret the information. If you had a Child's A patient with cirrhosis of the liver, they have a 90[%] chance of survival. If you have a Child's C that's actively bleeding, they have a much higher mortality rate. As an average, yes, 20[%]. But that takes all of them. The real, real sick ones and the ones that don't have as bad of a bleed. So there's a big spectrum there.

[FAKES' COUNSEL]: We never discussed–you brought up the Child's score. That's something we never discussed at your deposition, is it?

* * *

[ELOY]: Well, I don't know if we made inference [*sic*] to the Child's classification or not. I don't recall.

[FAKES' COUNSEL]: So you don't have a recollection of that?

[ELOY]: No, but if we discussed the articles, I'm sure it's in there.

* * *

[FAKES' COUNSEL]: Okay. Here's my question: Have you ever offered any opinion about what [decedent's] Child's score was?

[ELOY]: Not to you, no."

¶ 30 Eloy's counsel began his cross-examination by reading a portion of Eloy's deposition where he mentioned the Child-Pugh score. Fakes objected, noting that unless Eloy's counsel was attempting to impeach Eloy or refresh his recollection, he could not read from Eloy's deposition. Eloy's counsel withdrew his question and attempted to refresh Eloy's recollection regarding whether he mentioned the Child-Pugh score. Referring to his deposition, Eloy confirmed that he mentioned that metric during his testimony.

¶ 31 The following exchange then occurred:

"[FAKES' COUNSEL]: Judge, [based on] the rule of completeness, I would like [Eloy's counsel] to read the question and answer because there is no testimony about what [decedent's] Child score is.

[ELOY'S COUNSEL]: I don't disagree with that, I'd be happy to read the whole thing.

*** In fact, if I may, because this is the point I was just going to go to, in the rule of completeness, I would like to address an earlier question as well. It's going to lead right into the same thing, Your Honor.

THE COURT: Read it all day if you want to. That's up to you."

¶ 32     Reading from Eloy's deposition, counsel then asked Eloy a series of questions regarding survival rates. Eloy confirmed that at his deposition, he testified about other medical articles he provided to Fakes that documented mortality rates of 20% to 40% with each episode of bleeding esophageal varices. Eloy noted in his deposition that a 30% mortality rate was the "most quoted number."

¶ 33     Fakes then renewed her objection to the reading of Eloy's deposition. The following exchange occurred:

"THE COURT: *** [W]here do we stand?

[ELOY'S COUNSEL]: The rule of completeness allows me to put any attempt at impeachment into context. [Fakes] tried to impeach and suggest that there wasn't any discussion [of] Child's classification. That's this next paragraph."

Eloy's counsel then reread the portion of Eloy's deposition in which Eloy had earlier testified he mentioned the Child-Pugh Score in response to a question Fakes posed.

¶ 34     Scott Lippe, a board-certified physician in internal medicine and gastroenterology, explained that when disease prevents normal blood flow through the liver, the body finds a different path to the heart. The most common path is through the veins in the esophagus, which causes swelling, pressure, and eventually, uncontrolled bleeding that is life-threatening. Lippe recommended the employment of an aggressive regime to treat patients suffering from esophageal varices because once the bleeding starts, it becomes a "horrible challenge."

¶ 35     Lippe opined that Eloy did not use the "knowledge, skill, and care ordinarily used by a careful gastroenterologist" in that he failed to "address the bleeding [varices] of [decedent] in an appropriate fashion and having not done so, he also failed to monitor [decedent] in an appropriate fashion so that he knew what was going on." Lippe summarized that Eloy deviated from the proper medical standard of care in that he failed to (1) perform an endoscopy during decedent's ER examination, (2) identify and treat the cause of decedent's bleeding, (3) insert a nasogastric (NG) intubation tube to monitor decedent's bleeding in the absence of an endoscopy, and (4) appropriately monitor decedent to identify and treat the cause of her bleeding. Lippe opined to a reasonable degree of medical certainty that if Eloy had complied with the medical standard of care, decedent would have survived. Lippe concluded that bleeding esophageal varices caused decedent's death.

¶ 36     Lippe acknowledged that before endoscopic variceal banding emerged in the 1990s, a procedure called sclerotherapy was employed. Eloy used this treatment approach by administering medication to shrink the esophageal veins, which slowed decedent's blood flow. Eloy then scheduled decedent for a later endoscopy. Lippe also acknowledged that the medical standard of care in 2004 did not require banding of nonbleeding grade II or III varices and approximately 50% of variceal bleeding stops spontaneously.

¶ 37                                      2. *Eloy's Evidence*

¶ 38    Eloy, who was president of the Internal Medicine Subspecialty Associates, Ltd., a gastroenterology practice comprised of himself and his two physician partners, outlined his treatment of decedent, which began in 1985 for gastrointestinal bleeding caused by a condition in the lower part of decedent's colon. In July 1997, medical testing revealed that decedent had "positive markers" for hepatitis C. The following month, decedent was diagnosed with mild scarring of the liver. After a series of failed treatments, medical testing revealed that by May 1999, decedent had advanced cirrhosis of the liver. In April 2000, decedent discontinued further treatments because she could not tolerate the side effects.

¶ 39    On November 17, 2004, Duncan referred decedent to Eloy because he had found microscopic particles of blood in decedent's stool. Eloy reaffirmed that the results of his November 22, 2004, colonoscopy and upper endoscopy on decedent revealed she had grade II varices, noting that decedent's varices did not have "red spots" that signify blood clots or evidence of superficial ulcers indicative of a "high degree of bleeding." Following his examination, Eloy concluded that no medical evidence existed to show that decedent would likely bleed "in the next week or ten days or months."

¶ 40    With regard to his earlier account of decedent's November 26, 2004, visit to the ER, Eloy noted that during the approximately 90 minutes he was in the ER that evening, he saw no signs that decedent was actively bleeding. Decedent's high blood pressure at that time, which Eloy would expect to be low if she was bleeding, confirmed his assessment. Eloy documented that a day earlier, decedent experienced "very dark diarrhea," which could have been caused by various unrelated conditions. Because decedent had bled earlier, Eloy admitted her to the ICU for monitoring, prescribed medication to slow decedent's blood flow, and scheduled an endoscopy. Eloy opined that his actions to move decedent from the ER to the ICU fell within the medical standard of care. Eloy then mentioned his 1:30 a.m. order, in which he prescribed Demerol following the phone call from the ER.

¶ 41    Eloy's next conversation with the hospital, specifically ICU nurse Lisa Harmon, took place at 5:08 a.m. When Eloy attempted to explain his conversation with Harmon, Fakes objected based on hearsay. Eloy's counsel responded that "[t]his falls under the category of non-hearsay operative fact because it really goes to what he did." The trial court overruled the objection. Eloy then testified that Harmon informed him that (1) decedent's blood-test results revealed that her hemoglobin count had dropped from 10.4 to a "low[-]panic level of 6.2" and (2) decedent was "stable" at that time. Five minutes later, Eloy called the ICU and ordered an X-ray of decedent's abdomen because he had the feeling that "something's going on." Eloy then took a shower, shaved, dressed, and traveled to the hospital. When he arrived, ICU personnel were attempting to revive decedent. Eloy opined that his treatment of decedent on November 26 through 27, 2004, complied with the medical standard of care. Eloy admitted that his assessment five days before decedent died, doubting that her esophageal varices would bleed, was incorrect.

¶ 42    During Fakes' cross-examination, Eloy could not recall how many endoscopic variceal banding procedures he had performed. Fakes, reading from Eloy's deposition, noted that Eloy had performed the endoscopic variceal banding procedure on approximately 20 to 30 patients, which she characterized as "not a whole lot of experience." Eloy disagreed, claiming that 20 to 30 cases "is a very good experience." Fakes' counsel then engaged in the following discussion with Eloy:

"[FAKES' COUNSEL]: And in terms of whether or not if you would have banded her, you *** don't disagree with *** Lippe that you would have saved her life, do you?

[ELOY]: That's speculation. *** [E]ven if you banded them, they can still bleed. ***

[FAKES' COUNSEL]: You got there too late and you have never said–at your deposition I asked you if you had an opinion and you said no, right? You don't have an opinion that you would not have saved her life, do you?

[ELOY]: No. I said–I don't remember exactly what I said, but I don't know if I would have saved her life or not by doing that procedure."

¶ 43   During his redirect examination, Eloy's counsel, citing the rule of completeness, had Eloy confirm that he testified at his deposition that although he performed the endoscopic variceal banding procedure on approximately 20 to 30 patients experiencing bleeding esophageal varices, he performed that surgical procedure "multiple times on the same patient." Eloy also confirmed that he had no opinion regarding whether decedent would have lived if he had performed the endoscopic variceal banding procedure before decedent bled on November 27, 2004, because any answer would have been speculative.

¶ 44   Patrick Garrity, the hospital's ER physician working on the night of November 26, 2004, admitted that he did not remember decedent and did not know whether he personally examined her. Garrity explained that his responsibilities included supervising several physician assistants (PAs), whose responsibilities included seeing ER patients and accomplishing the necessary "physical exam work." The PAs would brief him on the patient, any test results, and their recommended treatment plan. Garrity would review the patient's ER chart and provide the PAs guidance. Garrity agreed that his supervisory role did not always result in face-to-face contact with an ER patient.

¶ 45   Decedent's ER chart documented that on November 26, 2004, at approximately 10:37 p.m., decedent arrived at the ER, complaining of vomiting blood an hour earlier. During her time in the ER, decedent was stable and was not experiencing any discomfort. Test results revealed microscopic traces of blood in decedent's stool. Garrity acknowledged that once Eloy arrived at the ER, decedent ceased being an ER patient. Despite this change of status, the ER continued to monitor decedent until her transfer to the ICU at approximately 2:50 a.m. on November 27, 2004. During that time, decedent's condition remained stable. Garrity provided his approving initials on the last page of decedent's ER chart, which documented the medical steps the PA took to address decedent's condition.

¶ 46   Duncan, decedent's primary care physician, testified that he examined decedent approximately every four months for her various ailments, which included diabetes, high blood pressure, and chronic hepatitis. On November 17, 2004, Duncan referred decedent to Eloy because he found microscopic traces of blood in decedent's stool. Duncan then recounted decedent's phone call at approximately 10 p.m. on November 26, 2004, informing him of her vomiting blood. Duncan did not travel to the ER that night, but sometime during the early morning of November 27, 2004, an ICU nurse called, requesting to administer a drug to prevent the possible buildup of fluid in decedent's lungs before performing a blood transfusion. Later that same morning, Duncan received another phone call from ICU, informing him that decedent's condition was "not good." At 7:30 a.m., Duncan arrived at the hospital and observed ICU personnel attempting to revive decedent. At some point during that attempt, Duncan spoke with Fakes and informed her that decedent's condition was "grave."

- 10 -

Duncan estimated that ICU personnel attempted to revive decedent for approximately one hour.

¶ 47 Michael Uzer, a board-certified physician in gastroenterology and internal medicine, did not agree with Lippe's assessment. If presented with a patient in decedent's condition on the evening of November 26, 2004, knowing that she had grade II esophageal varices, he would have ensured she was stable and scheduled a later endoscopic variceal banding procedure. If the patient later lost blood, as in this case, Uzer would have attempted to restabilize the patient by transfusing blood and performing the banding procedure earlier than expected. The administration of additional blood would take time because quickly replenishing the blood would result in extra pressure on the varices. Uzer estimated that a patient should have a hemoglobin count of approximately 9.0 before performing the procedure. Uzer stressed that patient stabilization takes priority over performing the procedure.

¶ 48 Uzer noted that decedent's vital signs were reliable indicators of decedent's condition, which showed decedent was stable while in the ER. Uzer noted that decedent's later abdominal pain was unusual because it "didn't really *** fit with gastroenterology hemorrhage." This pain suggested to Uzer that "something" in addition to decedent's bleeding was occurring, which Uzer said prompted Eloy to order an abdominal X-ray. Uzer did not have an opinion as to why decedent was experiencing abdominal pain. Uzer opined to a reasonable degree of medical certainty that from November 26 through November 27, 2004, the medical care Eloy provided decedent complied with the medical standard of care.

¶ 49                                            D. The Jury's Verdict

¶ 50 Following the presentation of evidence and argument, the jury rejected Fakes' medical malpractice claims and returned a verdict in Eloy's favor.

¶ 51 This appeal followed.

¶ 52                                                 II. ANALYSIS

¶ 53 Fakes argues that the trial court (1) erred by failing to impose sanctions against Eloy for violating Illinois Supreme Court Rule 213 (eff. Jan. 1, 2007) and (2) abused its discretion by admitting (a) evidence under the rule of completeness, (b) the testimony of two medical experts with whom defense counsel purportedly engaged in prohibited *ex parte* communications in violation of the *Petrillo* doctrine, (c) hearsay evidence, and (d) evidence the court had barred. Fakes also argues that the court violated her right to a fair trial by refusing to strike four prospective jurors for cause. We address Fakes' arguments in turn.

¶ 54                                       A. Fakes' Rule 213 Objection

¶ 55 Fakes argues that the trial court erred by failing to impose sanctions against Eloy for violating Illinois Supreme Court Rule 213 (eff. Jan. 1, 2007). We agree.

¶ 56                                       1. *The Proceedings at Trial*

¶ 57     As previously noted, at the March 2012 trial, Fakes questioned Eloy as an adverse witness in her case in chief regarding, in part, his opinion as to decedent's cause of death. At trial, Eloy initially responded, "I'm not exactly sure what caused her death." Immediately thereafter, Fakes impeached Eloy with his deposition testimony, in which he opined to a reasonable degree of medical certainty that bleeding esophageal varices caused decedent's death. After completing that impeachment, the trial court adjourned the proceedings for lunch. During that break, Fakes asked the court to entertain further the Rule 213 objection she had earlier raised during a sidebar conference. The court agreed to hold a brief hearing on that issue.

¶ 58     At that hearing–conducted outside the presence of the jury–Fakes moved to strike Eloy's testimony, arguing that because Eloy failed to show where in his deposition he opined to a reasonable degree of medical certainty that decedent's death was caused by something other than the bleeding esophageal varices, that testimony should be stricken and the jury should be instructed to disregard it.

¶ 59     In response, Eloy argued that no Rule 213 violation occurred because he had consistently disclosed that there was "something else going on." In support of his claim, Eloy read the following passage from his deposition:

> "[FAKES' COUNSEL]: Because the only way you would know whether or not for sure that those esophageal varices were bleeding and how badly is to do an endoscopy, right?
>
> [ELOY]: Yes and No. If she was actively bleeding from a varix, she would be vomiting blood actively. She would be passing blood rectally.
>
> [FAKES' COUNSEL]: What was her cause of death?
>
> [ELOY]: Don't know.
>
> [FAKES' COUNSEL]: You don't have an opinion as to what caused her death?
>
> [ELOY]: I believe that it could have been variceal bleed at that time.
>
> [FAKES' COUNSEL]: Have you heard the phrase reasonable degree of medical certainty before?
>
> [ELOY]: Yes, I have."

Eloy also provided the court a quote from his November 22, 2004, operative report in which he essentially surmised that no obvious reason existed for decedent's abdominal pain.

¶ 60     Fakes noted that the next question she asked, which Eloy omitted from his quote, elicited his opinion that to a reasonable degree of medical certainty, decedent's bleeding esophageal varices caused her death. Fakes then claimed Eloy's operative report was not relevant to her Rule 213 objection because it only described the colonoscopy and upper endoscopy procedures Eloy performed five days before decedent died.

¶ 61     Thereafter, the trial court, noting that it had denied Fakes' objection during the sidebar, denied her Rule 213 motion without further comment.

¶ 62                          2. *The Pertinent Sections of Illinois Supreme Court*
                          *Rule 213 and the Standard of Review*

¶ 63     "Rule 213, entitled 'Written Interrogatories to Parties,' governs discovery by interrogatories, as well as disclosure of the identity of witnesses who will testify at trial." *White v. Garlock Sealing Technologies, LLC*, 373 Ill. App. 3d 309, 323, 869 N.E.2d 244, 255 (2007).

Rule 213(f) segregates witnesses into the following three categorical types: (1) lay witnesses, (2) independent expert witnesses, and (3) controlled expert witnesses. Ill. S. Ct. R. 213(f) (eff. Jan. 1, 2007). Rule 213(f)(3) also provides (1) the definition of a controlled witness and (2) requirements a party must satisfy prior to trial, as follows:

> "A 'controlled expert witness' is a person giving expert testimony who is the party, the party's current employee, or the party's retained expert. For each controlled expert witness, the party must identify: (i) the subject matter on which the witness will testify; (ii) the conclusions and opinions of the witness and the bases therefor; (iii) the qualifications of the witness; and (iv) any reports prepared by the witness about the case." Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2007).

¶ 64    The importance of a party's compliance with the mandates contained in Rule 213(f) cannot be overstated, given the following restriction placed upon such a witness, as provided in Rule 213(g):

> "The information disclosed in answer to a Rule 213(f) interrogatory, or in a discovery deposition, limits the testimony that can be given by a witness on direct examination at trial. Information disclosed in a discovery deposition need not be later specifically identified in a Rule 213(f) answer, but, upon objection at trial, the burden is on the proponent of the witness to prove the information was provided in a Rule 213(f) answer or in the discovery deposition. Except upon a showing of good cause, information in an evidence deposition not previously disclosed in a Rule 213(f) interrogatory answer or in a discovery deposition shall not be admissible upon objection at trial." Ill. S. Ct. R. 213(g) (eff. Jan. 1, 2007).

Rule 213(i) mandates further that "[a] party has a duty to seasonably supplement or amend any prior answer or response whenever new or additional information subsequently becomes known to that party." Ill. S. Ct. R. 213(i) (eff. Jan. 1, 2007).

¶ 65    The supreme court's underlying policy in crafting Rule 213 concerned not only its efforts to "manage the complex and important process of discovery," but also its efforts to "avoid surprise" and "tactical gamesmanship." *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 109-10, 806 N.E.2d 645, 652 (2004). "A trial court's decision regarding whether an opinion has been adequately disclosed such that it may be admitted into evidence is reviewed applying the abuse-of-discretion standard." *Prairie v. Snow Valley Health Resources, Inc.*, 324 Ill. App. 3d 568, 576, 755 N.E.2d 1021, 1029 (2001). Under that standard, reversal is required only if no reasonable person would agree with the trial court's determination. *Id*.

¶ 66                              3. *The Opinion Testimony at Issue*

¶ 67    In this case, the parties do not dispute that Eloy (1) was a controlled expert witness as defined by Rule 213(f); (2) opined in his August 2008 discovery deposition that to a reasonable degree of medical certainty, decedent's death was caused by her bleeding esophageal varices; and (3) did not seasonably supplement or amend his prior deposition testimony as required by Rule 213(i). In her brief to this court, Fakes confines her Rule 213 claim to Eloy's testimony, "I'm not exactly sure what caused her death," in response to the question, "What is your opinion as to a reasonable degree of medical certainty as to the cause of [decedent's] death?"

¶ 68    Eloy dismisses Fakes' argument, claiming that she would have this court "focus on four lines in *** Eloy's deposition and ignore the rest." Eloy acknowledged that during his deposition, he opined to a reasonable degree of medical certainty that decedent's death was caused by her bleeding esophageal varices but asserts that this opinion does not "preclude additional opinions as to other contributing factors." In this regard, Eloy claims that his deposition testimony concerning other "potential contributing factors" that could have caused decedent's death, was "nothing more than extrapolation or [a] logical corollary of the opinions which he had already given, including that which was contained in the medical literature produced by him, and provided to [Fakes] at the time of his deposition." In support of that position, Eloy cites *Skubak v. Lutheran General Health Care Systems*, 339 Ill. App. 3d 30, 790 N.E.2d 67 (2003), for the proposition that a controlled expert witnesses is permitted to elaborate on his opinion.

¶ 69    In *Skubak*, 339 Ill. App. 3d at 39, 790 N.E.2d at 75, the controlled expert witness's Rule 213 disclosures revealed that the patient at issue had not developed a sore on the bottom of her foot while she was a hospital patient. The plaintiff claimed that the trial court erred by admitting testimony at trial that the controlled expert examined the patient's foot during a five-day period. *Id*. The trial court rejected that argument, finding that the disputed testimony was a "logical corollary of [the controlled expert's] disclosure." *Id.* at 39, 790 N.E.2d at 76. The appellate court affirmed. *Id.* at 41, 790 N.E.2d at 77.

¶ 70    *Skubak* is inapposite because in that case, the disputed trial testimony was consistent with the controlled expert's Rule 213 disclosure regarding the patient's condition. Here, Eloy's claim that the other "potential contributing factors" could have caused decedent's death directly contradicted his deposition testimony that decedent's death was caused by bleeding esophageal varices.

¶ 71    In *Sullivan*, 209 Ill. 2d at 108, 806 N.E.2d at 651, the plaintiff's controlled expert witness testified consistently with his deposition testimony but added a previously undisclosed opinion that a nurse deviated from her standard of care by not communicating effectively with another doctor. The trial court later barred that previously undisclosed opinion. *Id*. On appeal, the plaintiff argued that the " 'gist' " of her expert's barred trial testimony was an " 'elaboration' or a 'logical corollary' of, or 'effectively' implicated, [her] Rule 213 disclosure." *Id.* at 109, 806 N.E.2d at 652. The supreme court rejected the plaintiff's claim and in so doing noted that "Rule 213 permits litigants to rely on the disclosed opinions of opposing experts and to construct their trial strategy accordingly." *Id.*

¶ 72    In this case, Fakes was entitled to rely on Eloy's deposition testimony. See *Garlock*, 373 Ill. App. 3d at 326, 869 N.E.2d at 257 (the plaintiff had an absolute right to conduct her cross-examination of the defendant's medical expert with confidence that she knew all of his pertinent opinions because the defendant had disclosed them in response to her written interrogatories). If Eloy, as he contends in his brief, believed that other factors contributed to decedent's death, he needed to comply with the strict requirements of Rule 213(i) by supplementing his deposition. See *Foley v. Fletcher*, 361 Ill. App. 3d 39, 46-47, 836 N.E.2d 667, 674 (2005) ("Rule 213 disclosures are mandatory and strict compliance is required" (citing *Sullivan*, 209 Ill. 2d at 109, 806 N.E.2d at 651)). Accordingly, we conclude that (1) Eloy's undisclosed opinion testimony pertaining to decedent's cause of death violated Rule 213, and (2) the trial court abused its discretion by finding otherwise. However, our analysis does not end here.

¶ 73                           4. *The Appropriate Remedy*

¶ 74       In *Clayton v. County of Cook*, 346 Ill. App. 3d 367, 378, 805 N.E.2d 222, 232 (2003), the First District noted that, depending on the severity of the Rule 213 violation, the opposing party may move to (1) strike only the portion of the testimony that violates the rule–as Fakes attempted unsuccessfully in this case–(2) strike the witness's entire testimony and bar the witness from testifying further, or (3) have a mistrial declared. Quoting this court's decision in *Department of Transportation v. Crull*, 294 Ill. App. 3d 531, 690 N.E.2d 143 (1998), the *Clayton* court stated, " '[t]rial courts should be more reluctant under Rule 213 than they were under former Rule 220 (1) to permit the parties to deviate from the strict disclosure requirements, or (2) not to impose severe sanctions when such deviations occur.' " *Clayton*, 346 Ill. App. 3d at 378, 805 N.E.2d at 232 (quoting *Crull*, 294 Ill. App. 3d at 539, 690 N.E.2d at 148).

¶ 75       The *Clayton* court noted further that an appropriate remedy "must ensure that the applicable sanction allows for a fair trial rather than punish the party that committed the violation." *Clayton*, 346 Ill. App. 3d at 378, 805 N.E.2d at 233. In this vein, the court concluded that a "mistrial is warranted when the Rule 213 violation is of such character and magnitude as to deprive a party of a fair trial and the party seeking the mistrial demonstrates actual prejudice as a result." (Internal quotation marks omitted.) *Id.* at 381, 805 N.E.2d at 234.

¶ 76       In this case, Fakes' medical malpractice suit claimed that Eloy's failure to comply with the appropriate medical standard of care resulted in decedent's preventable death. Thus, Fakes was required to establish that Eloy "failed to possess and apply the knowledge and use the skill and care ordinarily used by a reasonably well qualified physician practicing in the same or similar localities under the circumstances similar to those shown by the evidence." Michael H. Graham, Graham's Handbook of Illinois Evidence § 702.9, at 650-51 (10th ed. 2010) (citing Illinois Pattern Jury Instructions, Civil, No. 105.01 (4th ed. 2006)).

¶ 77       Here, the cause of decedent's death was a critical issue in determining whether Eloy exercised the appropriate medical standard of care. As we have previously explained, in preparing her case, Fakes had the absolute right to expect that Eloy would provide the same opinion testimony at trial that he disclosed in his deposition–that is, his unequivocal, unqualified opinion that to a reasonable degree of medical certainty, decedent's death was caused by bleeding esophageal varices. Instead, Eloy's testimony at trial that (1) "I'm not exactly sure what caused her death," (2) "some other" nonspecific factors contributed to decedent's death, and (3) "I think [the bleeding esophageal varices] contributed to her death, but [were] not the cause of her death" directly contradicted his deposition testimony and resulted in prejudice that was not cured by Fakes' thorough impeachment. Eloy's claim that the undisclosed opinions at issue are "nothing more than extrapolation or [a] logical corollary of the opinions which he had already given," is belied by the contrary literal meaning of his undisclosed opinions and their apparent purpose, which was to distance himself from the opinion he provided at his August 2008 discovery deposition regarding decedent's cause of death.

¶ 78       Although each case presents different facts that affect the imposition of the appropriate sanction for a Rule 213 violation, we conclude that the type of violation that occurred in this case–that is, an undisclosed opinion on a critical issue before the trier of fact–warrants reversal. See *Clayton*, 346 Ill. App. 3d at 378-79, 805 N.E.2d at 233 (each case presents unique

- 15 -

factual circumstances, which should be considered in determining whether a sanction for a Rule 213 violation is imposed). Accordingly, we reverse the jury's verdict in favor of defendants and remand for a new trial.

¶ 79                              B. The Trial Court's Evidentiary Rulings

¶ 80        As previously outlined, Fakes also argues that the trial court abused its discretion by admitting (1) evidence under the rule of completeness, (2) the testimony of two medical experts with whom defense counsel purportedly engaged in prohibited *ex parte* communications in violation of the *Petrillo* doctrine, (3) hearsay evidence, and (4) evidence the court had barred. Although we have reversed based on a Rule 213 violation, we nonetheless address these issues because they may recur on remand. Prior to addressing the merits of Fakes' evidentiary claims, we set forth the standard of review.

¶ 81                                  1. *The Standard of Review*

¶ 82        "[E]videntiary rulings are within the sound discretion of the trial court and will not be reversed absent an abuse of discretion." *Clayton v. Planet Travel Holdings, Inc.*, 2013 IL App (4th) 120717, ¶ 48, 988 N.E.2d 1110. A reviewing court will not deem a trial court's evidentiary rulings an abuse of discretion unless no reasonable person would take the view adopted by the court. *Guski v. Raja*, 409 Ill. App. 3d 686, 698, 949 N.E.2d 695, 707 (2011).

¶ 83                2. *The Trial Court's Application of the Rule of Completeness*

¶ 84        Fakes argues that the trial court abused its discretion by admitting evidence under the rule of completeness. We disagree.

¶ 85        In *Rodriguez v. Northeast Illinois Regional Commuter R.R. Corp.*, 2012 IL App (1st) 102953, ¶ 71, 964 N.E.2d 731, the appellate court explained the common-law rule of completeness, as follows:

> "The rule of completeness provides that when a statement or writing has been admitted into evidence, the remainder of the writing should be admitted in order to put the original statement into proper context and to convey that to the jury. [Citation.] The additional portion of the writing must relate to the same subject matter as the original and tend to explain, qualify, or otherwise shed light on the meaning of the part already introduced."

Specifically, the intent of the completeness doctrine is to (1) prevent the trier of fact from being misled, (2) place the admitted portion in its proper context so that a correct and true meaning is conveyed, or (3) explain further the meaning of the evidence already received. *People v. Craigen*, 2013 IL App (2d) 111300, ¶ 45, 997 N.E.2d 743.

¶ 86        Before addressing Fakes' evidentiary claim–that is, the admissibility of the evidence Eloy sought to admit under the rule of completeness–we first briefly consider her underlying contention regarding the timing of Eloy's decision to invoke the rule. In support of her timing claim, Fakes cites Illinois Supreme Court Rule 212(c) (eff. Jan. 1, 2011), which pertains to the partial use of depositions and provides, as follows:

> "If only a part of a deposition is read or used at the trial by a party, any other party may *at that time* read or use or require him to read any other part of the deposition which

ought in fairness to be considered in connection with the part read or used." (Emphasis added.)

¶ 87 Concentrating on the words "at that time," Fakes asserts that Eloy's counsel "*never* objected under the rule of completeness or requested [Fakes'] counsel read any additional part of the deposition when [Eloy] was being refreshed or impeached." (Emphasis in original.) Fakes then infers a nefarious purpose, claiming that "counsel's tactics–sitting silently while [Eloy] was being impeached and then standing up at a later time and reading pages of his *** client's deposition to the jury–were tantamount to testifying for the witness."

¶ 88 We reject Fakes' assertion because it is well established that the rule of completeness does not have a timing requirement, as Fakes suggests. Instead, "where a conversation is related by a witness, the opposing party has a right to bring out all of the conversation on cross-examination." *In re W.D.*, 194 Ill. App. 3d 686, 702, 551 N.E.2d 357, 368 (1990). See *People v. Provo*, 409 Ill. 63, 66-67, 97 N.E.2d 802, 804 (1951) (finding no error in permitting pertinent portions of an oral conversation on redirect to place the testimony solicited on cross-examination in its proper perspective). Indeed, the rule of completeness is not limited to discovery depositions but also applies to the following broad range of evidence:

> "Oral conversations, parts of written or recorded statements or in the nature of addenda thereto, and written or recorded statements neither part of the previously introduced written or recorded statement nor in the nature of addenda thereto may be introduced by an opposing party on his or her next examination of the same witness, whether cross or redirect, provided such evidence tends to explain, qualify, or otherwise shed light on the meaning of the evidence already received." Graham, *supra* § 106.2, at 72.

¶ 89 With regard to Fakes' argument regarding the inadmissibility of the evidence Eloy sought to admit under the rule of completeness, Fakes directs us to defense counsel's redirect examination of Eloy in his case in chief. The record shows that during that examination, Eloy's counsel invoked the rule of completeness to clarify the following two issues: (1) to show Eloy testified that he had performed multiple banding procedures on the 20 to 30 patients to counter Fakes' characterization that 20 to 30 patients was not "a whole lot of experience" (we note Fakes did not object to this testimony) and (2) to confirm Eloy's testimony that any answer to the question regarding whether performing an endoscopic variceal banding procedure would have saved decedent's life was, at best, speculative to counter Fakes' suggestion that Eloy had no opinion on that issue.

¶ 90 Despite Fakes' urging that we find an abuse of discretion, we are mindful of the courtroom dynamics under which a trial judge makes the determination to admit evidence under the rule of completeness. We find it comparable to a trial judge's typically instantaneous ruling on an objection that the opposing party's cross-examination exceeded the scope of the direct examination. In that moment, trial judge A might sustain the objection and bar the trier of facts' consideration of that evidence and–under the same scenario–trial judge B might decide to overrule the objection and admit the evidence. On appeal, this court would not likely find an abuse of discretion under either scenario unless, in our view, the court's decision was "arbitrary, fanciful[,] or unreasonable." (Internal quotation marks omitted.) *Pister v. Matrix Service Industrial Contractors, Inc.*, 2013 IL App (4th) 120781, ¶ 55, 998 N.E.2d 123. In this case, no such abuse of discretion occurred.

¶ 91    Accordingly, we conclude that the trial court's admission of the deposition evidence Eloy provided pursuant to the completeness doctrine was relevant, particularly appropriate, and sufficiently tailored to place the evidence Fakes solicited during her cross-examination in its proper context. We further conclude that the aforementioned mortality rates and Child's score deposition testimony Eloy introduced under the rule of completeness was proper under that doctrine.

¶ 92                          3. *Fakes' Petrillo Claim*

¶ 93    Fakes argues that the trial court abused its discretion by admitting the testimony of two medical experts with whom defense counsel purportedly engaged in prohibited *ex parte* communications in violation of the *Petrillo* doctrine. We disagree.

¶ 94                          a. The *Petrillo* Doctrine

¶ 95    The underlying public policy principles governing a defense counsel's *ex parte* communications with a plaintiff's treating physician were first articulated in *Petrillo*. In that products-liability case, the defense attorney engaged in *ex parte* communications with the plaintiff's treating physicians, in violation of the court's order prohibiting such conduct. *Petrillo*, 148 Ill. App. 3d at 585, 499 N.E.2d at 955. On appeal, defense counsel argued that public policy does not prohibit such *ex parte* contact. *Id.* at 587, 499 N.E.2d at 955. As a matter of first impression, the appellate court rejected that argument, concluding that "*ex parte* conferences between defense counsel and a plaintiff's treating physician jeopardize the sanctity of the physician-patient relationship and, therefore, are prohibited as against public policy." *Id.* at 588, 499 N.E.2d at 957.

¶ 96                 b. Defense Counsel's Correspondence to Duncan and Garrity

¶ 97    On February 2, 2012, defense counsel mailed separate letters to Duncan and Garrity, enclosing a "Subpoena for Appearance at Trial." Those two letters informed the respective physicians that the trial in this case was scheduled to begin on March 5, 2012, and that their testimony was anticipated sometime on March 8 or 9, 2012. The letter then informed the physicians, as follows:

> "First, please understand we will try to be flexible in accommodating your appearance with a time least disruptive to your medical practice. That said, I am required to put a specific date and time on the [s]ubpoena. Your office may contact [the assistant] at our office upon receipt of this [s]ubpoena to discuss when your trial appearance will actually be presented. Again, we will do everything we can to accommodate your schedule"

In accordance with local court rules, a $25 check was included for "witness fee and mileage."

¶ 98    On February 29, 2012, defense counsel sent a second letter to Garrity, requesting that Garrity contact the assistant to schedule his testimony. The letter also informed Garrity that, if requested, the firm would provide him a copy of his September 2009 deposition. On March 2, 2012, the assistant sent a third letter to Garrity, enclosing a copy of his deposition. Copies of the four letters were mailed to Fakes at the same time they were mailed to Duncan and Garrity.

¶ 99                 c. Fakes' Pretrial Motion and the Trial Court's Preliminary Ruling

¶ 100     On March 5, 2012, Fakes filed a motion to bar the testimony of Duncan and Garrity as a sanction for defense counsel's improper *ex parte* communications with them. In support of her motion, Fakes enclosed the aforementioned letters.

¶ 101     At a hearing conducted that same day, Fakes argued that Eloy's counsel engaged in *ex parte* communications with Duncan and Garrity, thereby violating the prohibition against such communications and conferences between a defense counsel and a plaintiff's treating physician. Citing, in part, *Nastasi v. United Mine Workers of America Union Hospital*, 209 Ill. App. 3d 830, 838, 567 N.E.2d 1358, 1364 (1991), Fakes asserted that such *ex parte* communications violated public policy because they "jeopardize the sanctity of the confidential and fiduciary relationship between a physician and his patient."

¶ 102     Citing *Mahan v. Louisville & Nashville R.R. Co.*, 203 Ill. App. 3d 748, 754, 561 N.E.2d 127, 131 (1990), Eloy argued that Fakes' argument fails because the communications at issue were *de minimis* in that they involved administrative scheduling and did not result in the disclosure of any private or confidential information.

¶ 103     The trial court found *Mahan* persuasive and applicable and denied Fakes' motion, noting that the written and verbal contact between defense counsel's office and the physicians were *de minimis* and thus, did not violate *Petrillo*. Despite that finding, the court permitted Fakes to conduct a brief *voir dire* of Duncan and Garrity to determine the extent of the contact.

¶ 104                         d. The *Voir Dire* of Duncan and Garrity

¶ 105     Duncan testified that when he received defense counsel's February 2, 2012, letter, he forwarded it to the physician's group he was associated with, and that organization provided him with his September 2009 deposition as well as the scheduling information regarding his appearance at trial. Duncan did not have any contact or otherwise discuss any aspect of decedent's case with defense counsel or his staff.

¶ 106     Garrity testified that when he arrived to provide his September 2009 deposition, he had "no idea what the deposition was even about," no recollection of decedent, and could not recall whether he had examined decedent when she arrived at the ER. As Garrity and Eloy waited for Fakes' arrival, Eloy's attorney provided Garrity a copy of decedent's ER chart. Garrity could not remember any conversation that he had with Eloy's counsel at that time, stating, Eloy's counsel "gave me [a] copy of the emergency department chart that I hadn't seen up until then[,] and he gave me a chance to review it." Other than providing Garrity the chart, Eloy's counsel did not discuss any aspect of Fakes' pending suit with Garrity.

¶ 107     Upon receipt of the February 29, 2012, letter, Garrity called and spoke with the office assistant to coordinate a time to provide his testimony that would not conflict with his work schedule. Garrity did not discuss decedent's case with defense counsel's office.

¶ 108     After the hearing, the trial court reaffirmed its earlier denial of Fakes' motion, finding that the contact among defense counsel's office, Garrity, and Duncan was *de minimis*.

¶ 109                         e. The *Mahan* Case

¶ 110     In *Mahan*, 203 Ill. App. 3d at 754, 561 N.E.2d at 131, the court briefly discussed the underlying policy considerations in *Petrillo* and then applied that holding to the facts presented, as follows:

"The holding of *Petrillo* was based on the strong public policy in favor of preserving the confidential and fiduciary relationship between a physician and his patient. In this case, the communication between defendant's attorney and plaintiff's physician could in no way have jeopardized that policy. The *ex parte* communication here was limited to a brief discussion, lasting no more than 30 seconds, prior to the physician's deposition during which time the defendant's attorney merely asked the physician if he had seen the plaintiff's [computed tomography (CT)] scans. The doctor indicated that he had not had time to review the scans prior to the deposition but that he had reviewed his notes and determined that the scans were not relevant to what he had treated the patient for. The attorney then apparently asked the physician whether he would then have time to review the scans, and the doctor indicated that it would take him about 5 or 10 minutes to do so and that because of the time factor he would go along with what the hospital radiologist had found regarding the results of those scans."

¶ 111                 f. The Propriety of the Trial Court's *Petrillo* Ruling

¶ 112       In this case, the parties concede that defense counsel, through his representatives, communicated with Duncan by letter and Garrity through letters and a phone call. The evidence presented revealed that the intent of that contact was to coordinate the March 2012 court appearances of Duncan and Garrity with their respective work schedules. The testimony provided by Duncan and Garrity, which the trial court found credible, revealed the actual extent of that contact, which was limited to scheduling.

¶ 113       The trial court found that the communications among defense counsel's representatives, Duncan, and Garrity was *de minimis* and, pursuant to the holding in *Mahan*, did not violate the *Petrillo* doctrine. The issue before us concerns the propriety of that ruling–that is, did the court abuse its discretion by making such a finding. We conclude that the court did not.

¶ 114       In *Petrillo*, 148 Ill. App. 3d at 610, 499 N.E.2d at 971, the appellate court provided the following guidance when analyzing the question this court now considers:

"We believe that this issue, namely, whether defense counsel may properly engage in *ex parte* conferences with a plaintiff's treating physician, is best decided by relying on principles of public policy, obligations created by confidential and fiduciary relationships, and the ethical responsibilities of modern-day professionals."

¶ 115       We agree with the trial court that the specific policy the *Petrillo* court sought to protect by prohibiting a defense counsel's communications with a plaintiff's treating physician–namely, the confidential and fiduciary relationship between a doctor and the patient–were not implicated by contact that merely sought to facilitate the physician's appearance at trial by preemptively resolving any scheduling conflicts. In so concluding, we reject Fakes' assertion that "*Petrillo* bars all contact–under the guise of social nicety or not–and focuses on the potential, rather than actual, harm that could result." The *Petrillo* court was concerned with a situation where " 'the physician divulges to a *third party* information which the patient originally disclosed to the physician with the belief that the information would remain confidential unless the patient gave his consent otherwise.' " (Emphasis in original.) *Hall v. Flowers*, 343 Ill. App. 3d 462, 467, 798 N.E.2d 757, 760 (2003) (quoting *Petrillo*, 148 Ill. App. 3d at 591, 499 N.E.2d at 959). A bright-line prohibition against any contact–as Fakes suggests–would diminish the important public policy issues the *Petrillo* court specifically addressed.

¶ 116　　For the reasons stated, we conclude that the trial court did not abuse its discretion by denying Fakes' motion to bar the testimony of Duncan and Garrity for violating *Petrillo*.

¶ 117　　In so concluding, we note that in (1) Fakes' March 2012 motion to bar the testimony of Duncan and Garrity, (2) the later hearing at which the trial court considered that motion, and (3) her July 2012 posttrial motion, Fakes did not argue an issue she now raises on appeal–namely, that the court should have also barred Garrity's testimony on the ground that he was not competent to testify as required by Illinois Rules of Evidence 602 (eff. Jan. 1, 2011). The rule states that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Ill. R. Evid. 602 (eff. Jan. 1, 2011). But see *In re Katarzyna G.*, 2013 IL App (2d) 120807, ¶ 10, 995 N.E.2d 585 ("Ordinarily, the failure to raise an issue in the trial court results in forfeiture of that issue on appeal."). Fakes contends in her reply brief that the court's failure to bar Garrity's testimony constitutes plain error.

¶ 118　　The application of the plain-error doctrine, provided for in Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967), states, as follows:

　　　　"(a) Insubstantial and Substantial Errors on Appeal. Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."

¶ 119　　In *Belfield v. Coop*, 8 Ill. 2d 293, 313, 134 N.E.2d 249, 259 (1956), the supreme court held that the plain-error doctrine applies to civil cases under the following circumstances:

　　　　"If prejudicial arguments are made without objection of counsel or interference of the trial court to the extent that the parties litigant cannot receive a fair trial and the judicial process stand without deterioration, then upon review this court may consider such assignments of error, even though no objection was made and no ruling made or preserved thereon."

¶ 120　　In accord with *Belfield*, this court has long held that because civil proceedings do not implicate sixth amendment concerns (U.S. Const., amend. VI), application of the plain-error doctrine to civil cases should be " 'exceedingly rare and limited to circumstances amounting to an affront to the judicial process.' " *Holder v. Caselton*, 275 Ill. App. 3d 950, 959, 657 N.E.2d 680, 687 (1995) (quoting *Allison v. Stalter*, 251 Ill. App. 3d 127, 131, 621 N.E.2d 977, 979 (1993)). See *In re J.R.*, 342 Ill. App. 3d 310, 317, 794 N.E.2d 414, 420-21 (2003) (quoting *Holder* and *Allison* approvingly). Indeed, in *Gillespie v. Chrysler Motors Corp.*, 135 Ill. 2d 363, 377, 553 N.E.2d 291, 298 (1990), the supreme court explained that the civil cases in which the plain-error doctrine was applied "involved blatant mischaracterization of fact, character assassination, or base appeals to emotion and prejudice."

¶ 121　　Because (1) Fakes has forfeited her contention and (2) we conclude that her evidentiary claim falls far short of constituting an affront to the judicial process, we decline to consider it under the plain-error doctrine.

¶ 122　　　　　　　　　　　　4. *Fakes' Hearsay Claim*

¶ 123　　Fakes argues that the trial court abused its discretion by admitting hearsay evidence. We disagree.

¶ 124  " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Jan. 1, 2011). Unless it falls within a recognized exception to the rule, hearsay is not admissible. *Mowen v. Holland*, 336 Ill. App. 3d 368, 372, 783 N.E.2d 180, 183 (2003). "An out-of-court statement offered to prove its effect on a listener's mind or to show why he subsequently acted as he did is not hearsay and is admissible." *In re Marriage of Roepenack*, 2012 IL App (3d) 110198, ¶ 44, 966 N.E.2d 1024.

¶ 125  Fakes' hearsay argument concerns the February 27, 2004, conversation Eloy had with Harmon at approximately 5:08 a.m. Eloy testified at trial that during their conversation, Harmon informed him, in pertinent part, that decedent's medical condition was stable. (Harmon did not testify.) The trial court then overruled Fakes' hearsay objection based on counsel's response that Harmon's statement regarding decedent's medical condition was not offered for its truth but, instead, to show the effect it had on Eloy. In particular, to explain why Eloy showered, shaved, and got dressed before traveling to the hospital. Fakes contends that Harmon's statement that decedent was stable was offered for its truth and did not fall under an established hearsay exception. In support of her claim, Fakes directs us to Eloy's closing argument, which we summarize, as follows.

¶ 126  During closing arguments, Eloy's counsel told the jury that the "real issue" in this case concerned what happened between 5:08 a.m. and 8:15 a.m., and whether Eloy's actions during that time were within the medical standard of care. His argument continued as follows:

"Eloy appropriately picked up the phone at 5:08 [a.m.], took a report from an extremely well qualified ICU nurse, *** heard that [decedent's] hemoglobin had fallen over a period of time and [decedent] was stable. There was no report that [decedent] was bleeding. There was no report of any active process going on at that time. She wasn't bleeding orally, she wasn't bleeding rectally. *She was stable*. *** Eloy did what he was required to do under the standard of care. There really isn't a lot of dispute about that. *** He ordered [decedent] transfused and stabilized in exactly the way he should have[,] which is, you don't just flood [blood] in because it makes the condition worse[.] Instead what [Eloy] ordered is two units [of blood] over three hours. He then did what he needed to do, whatever that was, he got up and got moving. There wasn't anything for him to do at the hospital. And something very interesting, at no time *** after 5:08 [a.m.] did anyone call *** Eloy and say, [decedent] is now bleeding. Why is that? Because she wasn't. Wasn't until *** 7:25[ ] when [decedent] started to bleed. At 7:30 [a.m., the ICU] call[s] the code. [Eloy] doesn't have any place in the code process." (Emphasis added.)

¶ 127  Fakes asserts that although Eloy informed the trial court that the evidence at issue was offered for its effect, Eloy later argued that testimony substantively during his closing argument. We note, however, that Fakes' overarching claim requires this court to conflate the two issues she identifies and conclude that because Eloy argued the evidence improperly at closing arguments, the court abused its discretion by initially admitting that evidence. We decline to do so.

¶ 128  The fatal flaw in Fakes' assertion is that she fails to provide any support for the necessary proposition that the trial court was under an obligation to *sua sponte* prevent Eloy from arguing substantively the evidence the court initially admitted for a limited purpose. This obligation, however, belongs to Fakes not the court. See *Babikian v. Mruz*, 2011 IL App (1st) 102579,

- 22 -

¶ 13, 956 N.E.2d 959 ("[T]he failure to object to allegedly improper comments during closing argument operates as a forfeiture of the objection.").

¶ 129    To the extent Fakes argues that the trial court abused its discretion by admitting Harmon's characterization of decedent's condition for the limited purpose of its effect on Eloy, we reject that claim because the record shows the court was well within its discretion to do so. Having previously concluded that reversal and remand of this case is warranted, we need not address further Fakes' forfeited argument.

¶ 130    In so concluding, we note that the issue of a party's initially offering evidence for a limited purpose and then arguing the same evidence substantively is entirely foreseeable. To prevent such an occurrence, a better practice would be for the opposing party to request the trial court provide the jury a limiting instruction immediately after the court admits the evidence for its limited purpose. In the absence of such a motion, the court may *sua sponte* raise the question of whether the opposing party wishes the jury to be so instructed. See Graham, *supra* § 105.1, at 67 ("The opposing party is entitled, on request, to an instruction to the jury limiting their use of the evidence" but "the court may *sua sponte* give a limiting instruction or preferably inquire of counsel's desire as to one being given."). This issue should then be revisited during the jury instruction conference so that the parties and the court are reminded of the limited purpose for which the evidence was admitted, thereby reminding the parties that such limited evidence should not be argued to the jury as if it were admitted as substantive evidence. Fakes might also have requested that the jury be instructed regarding the limited purpose of the evidence. See, for example, Illinois Pattern Jury Instructions, Criminal, No. 3.14 (4th ed. 2000) (providing the limiting instruction regarding how a jury may consider proof of other offenses or conduct for various limiting purposes); *People v. Butler*, 377 Ill. App. 3d 1050, 1067, 882 N.E.2d 636, 649 (2007) (" 'Because other-conduct evidence poses a risk of significant prejudice to defendant, this court has *suggested* trial courts not only instruct the jury in accordance with IPI Criminal 4th No. 3.14 at the close of the case, but also at the time the evidence is first presented to the jury.' " (Emphasis in original.) (quoting *People v. Brown*, 319 Ill. App. 3d 89, 100, 745 N.E.2d 173, 183 (2001))); *People v. Denny*, 241 Ill. App. 3d 345, 360-61, 608 N.E.2d 1313, 1324 (1993) (holding that "trial courts should not only instruct the jury in accordance with IPI Criminal 2d No. 3.14 at the close of the case, but also orally from the bench (unless defendant objects) at the time the evidence is first presented to the jury").

¶ 131                    5. *Fakes' Motion in Limine Claim*

¶ 132    Fakes argues that the trial court abused its discretion by admitting evidence the court had barred. We agree.

¶ 133                    a. Fakes' Pretrial Motion *in Limine*

¶ 134    In February 2012, Fakes filed a motion *in limine*, requesting, in pertinent part, that the trial court prohibit defendants from "communicating, implying, or otherwise inferring" the "personal or family circumstances" of Eloy. Following a hearing on that motion conducted later that month, the court granted Fakes' motion *in limine*.

¶ 135                    b. Eloy's Trial Testimony

¶ 136    In her case in chief, Fakes called Eloy as an adverse witness and after asking him his name, address, and his occupation, questioned him further, as follows:

"[FAKES' COUNSEL]: Did you attend the necessary education and training to become a medical doctor?

[ELOY]: I did ***.

[FAKES' COUNSEL]: Where did you do your undergraduate training?

[ELOY]: In Mexico.

[FAKES' COUNSEL]: What was the name of the university?

[ELOY]: Universidad de Guadalajara.

[FAKES' COUNSEL]: Where did you get your medical degree?

[ELOY]: Universidad de Guadalajara.

[FAKES' COUNSEL]: What year did you complete your medical training in Mexico?

[ELOY]: 1976.

[FAKES' COUNSEL]: After you completed your education and schooling in Mexico, did you come to the United States?

[ELOY]: I came to the United States in 1979, I believe.

[FAKES' COUNSEL]: And from that point forward, have you lived in the United States?

[ELOY]: I have."

¶ 137    In his case in chief, Eloy began his testimony by explaining his medical credentials. In presenting his early educational background, the following exchange occurred:

"[ELOY'S COUNSEL]: Let's talk about that training. Where did you attend college?

[ELOY]: [I] went to *** college in Mexico.

[ELOY'S COUNSEL]: Where did you grow up[?]

[ELOY]: In Mexico.

[ELOY'S COUNSEL]: *** How did you get to Mexico, how long did you stay, why did you go to school in Mexico[?]

[ELOY]: I had nothing to do with it. I was five years old, born in California. My father had a heart attack. He decided that he didn't want to live–he found this ideal place with beautiful weather–

[FAKES' COUNSEL]: *** Judge, I have an objection based on the pretrial order about the irrelevance of personal family matters.

THE COURT: Overruled. You may proceed.

[ELOY'S COUNSEL]: Thank you. ***

[ELOY]: –so my parents decided that they wanted to move to Mexico. And I was five years old, I couldn't say no or yes.

[ELOY'S COUNSEL]: How long did you live in Mexico?

[ELOY]: Until I was age 29 or 30."

Thereafter, Eloy recounted his training in the United States, which included a 2½-year medical research project at the University of Texas in Houston; a 3-year internal medicine residency program at Saint Francis Hospital in Evanston, Illinois, where he eventually became a chief medical resident; and a 2-year fellowship at Saint Francis Hospital where he studied gastroenterology. In 1983, Eloy began practicing at Decatur Memorial Hospital and became board certified in internal medicine and gastroenterology.

¶ 138                              c. Fakes' Claim of Error

¶ 139    We first note the rule that "[i]rrelevant evidence is not admissible." *Maffett v. Bliss*, 329 Ill. App. 3d 562, 574, 771 N.E.2d 445, 455 (2002). "[E]vidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the determination of the action either more or less probable than it would be without the evidence." *Downey v. Dunnington*, 384 Ill. App. 3d 350, 387, 895 N.E.2d 271, 301 (2008).

¶ 140    In this case, the overarching controversy before the jury concerned whether Eloy complied with the medical standard of care when he treated decedent for her bleeding esophageal varices. Thus, evidence regarding Eloy's credentials–that is, that Eloy was an Illinois-licensed physician who had certain experience and expertise in the specialized medical field of gastroenterology–was relevant and admissible. In contrast, the underlying family circumstances that caused him to attend medical school in Mexico were irrelevant because such evidence would not have assisted the jury in resolving a question of fact. Fakes contends that Eloy's "intentional violation artificially bolstered [his] credibility by offering a sympathetic rationale for why he attended medical school in Mexico and not the United States."

¶ 141    In response, Eloy argues that the evidence concerning his medical school education in Mexico was relevant to "rehabilitate *** and help establish for the jury that he did not experience an inferior education by attending medical school in Mexico." We are unpersuaded that any such rehabilitation was required because on the record before us, the implication that Eloy attended an inferior medical school was nonexistent. Even if such an implication had been made, the fact that Eloy came to live in Mexico under unfortunate circumstances could have no possible bearing on the quality of medical education he received at the Universidad de Guadalajara. In this regard, we reaffirm what this court wrote in *Downey*, 384 Ill. App. 3d at 387, 895 N.E.2d at 301, that the use of irrelevant and inadmissible evidence "constitutes an aberrant practice that should not be tolerated."

¶ 142    What we find particularly egregious and bothersome is that Fakes properly sought to exclude this irrelevant and inadmissible evidence by filing a motion *in limine*, presenting her argument in a pretrial hearing, and receiving a favorable ruling from the trial court. If, as Eloy contends, Fakes did attempt to solicit evidence that communicated, implied, or otherwise suggested a negative connotation regarding Eloy's medical training, Eloy's recourse was to present his claim to the court, outside the jury's presence, and obtain a ruling instead of simply choosing during trial to ask irrelevant questions about his personal or family circumstances.

¶ 143    Accordingly, we agree with Fakes that the trial court abused its discretion by admitting evidence pertaining to Eloy's family circumstances.

¶ 144            C. Fakes' Motion To Strike Certain Prospective Jurors for Cause

¶ 145    Fakes argues that the trial court erred by failing to strike four prospective jurors for cause. Specifically, Fakes contends that the court's denial of her motion to dismiss for cause veniremembers A through D required her to exhaust her peremptory challenges, which forced her to accept juror G.M. We disagree.

¶ 146    "The determination of whether a prospective juror is capable of giving the parties a fair and impartial trial rests in the sound discretion of the trial judge, whose determination should not be set aside unless it is against the manifest weight of the evidence." *Magna Trust Co. v. Illinois Central R.R. Co.*, 313 Ill. App. 3d 375, 390, 728 N.E.2d 797, 810 (2000).

¶ 147    In *In re Commitment of Trulock*, 2012 IL App (3d) 110550, ¶ 42, 970 N.E.2d 560, the respondent argued that he was prejudiced by the trial court's denial of his motion to strike two prospective jurors for cause. As a result, the respondent claimed that he was forced to use two peremptory challenges and had none remaining to strike a third objectionable juror. *Id*. The appellate court applied the following test to address respondent's claim: "[I]n Illinois[,] *** a court's failure to remove a juror for cause is grounds for reversal only if prejudice can be shown; that is, only if the party challenging the juror has exercised all of [the] peremptory challenges *and an objectionable juror was allowed to sit on the jury*." (Emphasis added.) *Id.* ¶ 45, 970 N.E.2d 560. The court then rejected the respondent's argument, concluding that he failed to show how he was prejudiced by the juror at issue. *Id.* ¶ 46, 970 N.E.2d 560.

¶ 148    In support of her claim, Fakes highlights specific answers prospective jurors A through D provided during *voir dire* to purportedly show their respective biases. We need not, however, reach the merits of these specific claims because even if we were to agree with Fakes that the court erred by denying her motions to strike any or all four prospective jurors, Fakes does not address how she was prejudiced by the empanelling of juror G.M., the juror whom Fakes claims she was forced to accept because she had used all of her peremptory challenges. Instead, Fakes asserts that the burden of showing how she was prejudiced by G.M.'s presence on the jury "ignores the crucial difference between requiring a party to use one or two peremptory strikes on objectionable jurors and requiring a party to use a full 80% of her strikes on jurors that should have been stricken for cause." Citing *General Motors Corp. v. Jernigan*, 883 So. 2d 646, 672 (Ala. 2003), Fakes urges this court to distinguish *Trulock* by "recognizing that whereas requiring a party to wrongfully use one or two peremptory strikes might constitute harmless error *** requiring a party to wrongfully use 80% of her peremptory strikes on biased jurors *** substantially impairs her right to those strikes afforded."

¶ 149    We decline Fakes' invitation to establish some sort of mathematical standard to measure the effect that the allegedly erroneous denial of a motion to strike for cause has on a party's overall number of peremptory challenges. Simply put, that is not the law in Illinois, nor has it been for at least 126 years. In *Spies v. People*, 122 Ill. 1, 257-58, 12 N.E. 865, 989 (1887), the Illinois Supreme Court was presented with the same argument Fakes makes here, and the supreme court wrote the following:

"Counsel for the [defendants] complain, that the trial court overruled their challenges for cause of [26] talesmen ***. As they afterwards peremptorily challenged the talesmen so referred to, no one of them sat upon the jury. ***

*** [The defendants'] peremptory challenges *** were all used by them before the twelfth juror was taken.

After the defendants had examined the twelfth juror, *** they challenged him for cause. Their challenge was overruled and they excepted.

*** It is claimed that, inasmuch as the defendants exhausted all their peremptory challenges before the panel was finally completed, the action of the court in regard to these particular jurors will be considered, and, if erroneous, such action is good ground of reversal. We think it must be made to appear that an objectionable juror was put upon the defendants after they had exhausted their peremptory challenges. Unless objection is shown to one or more of the jury, who *tried* the case, the antecedent rulings of the court upon the competency or incompetency of jurors, who have been challenged and stood aside, will not be inquired into in this court. [Citation.]

We can not reverse this judgment for errors committed in the lower court in overruling challenges for cause to jurors, even though defendants exhausted their peremptory challenges unless it is further shown that an objectionable juror was forced upon them and sat upon the case after they had exhausted their peremptory challenges. This doctrine is ably discussed in *Loggins v. State*, 12 Tex. Ct. App. 65. We think the reasoning in that case is sound and answers the objection here made." (Emphasis in original and internal quotation marks omitted.)

¶ 150    We are not surprised that Fakes does not assert that she was prejudiced by juror G.M. because the record is devoid of any basis for such a claim. In other words, no evidence existed to show that G.M. was biased or would fail to heed the court's instructions regarding her role as a juror. Accordingly, we reject Fakes' contention and adhere to the established principle stated in *Spies* and reiterated in *Trulock*.

¶ 151                                   III. CONCLUSION

¶ 152    For the foregoing reasons, we reverse and remand with directions to conduct a new trial.

¶ 153    Reversed and remanded with directions.